780 F.2d 352
 12 Soc.Sec.Rep.Ser. 104, Medicare&Medicaid Gu 35,071
BUTLER COUNTY MEMORIAL HOSPITAL, a nonprofit corporation, Appellee,
v.
Margaret M. HECKLER, Secretary of Health and Human Services.
Appeal of UNITED STATES of America, Appellant.
 No. 85-3240.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 5, 1985.
Decided Dec. 30, 1985.
 
 Ira S. Lefton (Argued), Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellee.
 Beverly Dennis, III, Regional Atty., Hanes S. Feight, Jr. (Argued), Asst. Regional Atty., Office of the General Counsel, Dept. of Health and Human Services Region III, Philadelphia, Pa., J. Alan Johnson, U.S. Atty., Judith K. Giltenboth, Asst. U.S. Atty., Pittsburgh, Pa., for appellant.
 Before ADAMS, Acting Chief Judge, GIBBONS and STAPLETON, Circuit Judges.
 
 OPINION OF THE COURT
 
 1
 ADAMS, Acting Chief Judge.
 
 
 2
 This civil action challenges a final determination of the Secretary of Health and Human Services concerning the proper rate of Medicare reimbursement for certain hospital services. The district court disputed the Secretary's conclusions, and entered summary judgment for the plaintiff. Since we conclude that this decision did not accord the appropriate deference to administrative policies in a complex area, we will reverse.
 
 I.
 
 3
 The Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. Secs. 1395-1395zz (West 1983), provides federal funding for medical care for the aged and disabled, and consists of two parts. Part A is an insurance program covering inpatient hospital care and extended post-hospital or home health care; it is funded by Social Security payroll contributions. Id. at Secs. 1395c-1395i-2. Part B provides insurance benefits for physician services and outpatient services and supplies: it is funded by individual premium payments and federal contributions. Id. at Secs. 1395j-1395w. This appeal involves the Part A program.
 
 
 4
 For 1983 and earlier cost years, the Secretary reimbursed providers such as plaintiff, Butler County Memorial Hospital, for the reasonable cost of Part A services. Id. at Secs. 1395x(u), 1395x(v)(1)(A).[1] The statute allows the Secretary to appoint a "fiscal intermediary" to ascertain the reasonable costs owed to providers and to process claims and disburse funds. Id. at Sec. 1395h.
 
 
 5
 Most provider costs are reimbursed at a single per diem rate, but a regulation promulgated by the Secretary allows a higher level of payment for "special care units" (SCUs). During the relevant time, it provided:
 
 
 6
 Intensive care units, coronary care units, and other special care inpatient hospital units. To be considered an intensive care unit, coronary care unit, or other special care inpatient hospital unit, the unit must be in a hospital, must be one in which the care required is extraordinary and on a concentrated and continuous basis and must be physically identifiable as separate from general patient care areas. There shall be specific written policies for each of such designated units which include, but are not limited to burn, coronary care, pulmonary care, trauma, and intensive care units but exclude postoperative recovery rooms, post-anesthesia recovery rooms, or maternity labor rooms.
 
 
 7
 42 C.F.R. Sec. 405.452(d)(10) (1978).
 
 
 8
 In this matter, the fiscal intermediary, Blue Cross of Western Pennsylvania, determined that costs incurred by a certain unit in the Butler Hospital should be reimbursed at the lower level in the 1980 cost year and not as an SCU. Blue Cross decided that the hospital's "Maxicare Unit" (MCU) met all of the regulatory requirements for SCUs, except that the care provided was not "extraordinary, concentrated and continuous." This decision decreased the hospital's claimed reimbursement by $45,000 in the 1980 cost year.[2] The hospital first appealed to the Provider Reimbursement Review Board, which affirmed the intermediary, and then to the Deputy Administrator of the Health Care Financing Administration, who also affirmed. The decision of the Deputy Administrator represents the final position of the Secretary. 42 U.S.C. Sec. 1395oo(f)(1) (West Supp.1985).
 
 
 9
 The Deputy Administrator wrote that the regulatory terms do not lend themselves to precise definition, thus in determining whether a unit qualifies as an SCU the specific types of SCUs enumerated in the regulation should be used as points of reference. The Secretary's position is that the intensity of care provided by an SCU should not only be significantly greater than routine care but also "substantially the same" as that provided in the other types of units mentioned in Sec. 405.452(d)(10). In applying this standard, the Secretary considered evidence relating to the hospital's intensive care unit (ICU) and found that the care provided there was substantially more intensive than MCU care. In reversing this decision, the district court rejected the Secretary's interpretation of the regulation. It decided that the only relevant question was whether the MCU's services were extraordinary, concentrated and continuous, and that comparison with other SCUs was irrelevant. It further held that the MCU met the regulatory requirement.
 
 II.
 
 10
 This Court's role is not to impose its own interpretation of the SCU regulation, but instead to defer to the Secretary's position so long as it is reasonable. Presinzano v. Hoffman La Roche, Inc., 726 F.2d 105, 111 (3d Cir.1984). The reference in the provision to "extraordinary, concentrated and continuous care" does not lend itself to easy definition, and "a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt." Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). That construction controls "unless it is plainly erroneous or inconsistent with the regulation." Id.; United States v. Larionoff, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977).
 
 
 11
 In addition, the provision permitting judicial review of the Secretary's Medicare determinations requires that such review be conducted in accord with the Administrative Procedure Act. 42 U.S.C. Sec. 1395 oo(f)(1) (West Supp.1985). That statute requires that a court uphold agency policies, including those pronounced in adjudications such as that at issue here, 5 U.S.C. Secs. 551(13), 701 (1982), unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," id. at Sec. 706(2)(A).[3] We must therefore accept the agency's view so long as the "interpretation is within the range of reasonable meanings that the words of the regulation admit." Psychiatric Institute of Washington, D.C., Inc. v. Schweiker, 669 F.2d 812, 813-14 (D.C.Cir.1981) (per curiam); see Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980).
 
 
 12
 Such deference is especially appropriate here, where the Secretary's resolution involves a complex scheme of reimbursement for a sizable number of medical procedures. Legislators and judges are not medical specialists, and for that reason it is necessary that administrative agencies develop and apply medical expertise. Accordingly, Congress described only sparsely the means of assessing reasonable costs owed to Medicare providers, and instead assigned the primary responsibility for such assessments to the Secretary. 42 U.S.C. Sec. 1395x(v)(1)(A) (1982); see also id. at Secs. 1395g(a), 1395hh. We must be cautious lest we disturb this appropriate allocation of governmental functions.
 
 
 13
 Turning to the proper interpretation of the SCU regulation, we note first that this Court has had two opportunities to assess the Secretary's interpretation of the SCU regulation, and its summary affirmances in those cases bred some confusion. In Saint Luke's Hospital of Bethlehem, Pa. v. Schweiker, [1981-2 Transfer Binder] Medicare & Medicaid Guide (CCH) p 31,501 (E.D.Pa. Aug. 12, 1981), aff'd mem., 688 F.2d 824 (3d Cir.1982), the district court rejected the Secretary's contention that care provided in a proposed SCU should be "equal" to that provided in recognized SCUs, and reversed the administrative refusal to recognize a particular hospital unit as an SCU. Later, in Metropolitan Hospital v. Provider Reimbursement Review Board, [1983-2 Transfer Binder] Medicare & Medicaid Guide (CCH) p 33,101 (E.D.Pa. July 11, 1983), aff'd mem., 735 F.2d 1350 (3d Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 781, 83 L.Ed.2d 775 (1985), the district court upheld the Secretary's comparison of a hospital's MCU with other SCUs in the facility, and its denial of SCU status to a provider. The district court cited Saint Luke's, however, and agreed with its decision that a strict equality test is "unsupported by the statutory language." Metropolitan Hospital, p 33,101 at 10538 n. 2.
 
 
 14
 The Secretary now insists that both cases comport with her current interpretation that proposed SCUs be "substantially the same" as others listed in the regulation. This appears to be a fair characterization of the cases, and also a permissible interpretation of the regulation. As the court observed in John Muir Memorial Hospital, Inc. v. Schweiker, 664 F.2d 1337 (9th Cir.1981), the terms "extraordinary, concentrated and continuous" do not lend themselves to a ready medical definition. In view of its ambiguity, the regulation may reasonably be perceived as ejusdem generis, limiting its coverage to units similar to those enumerated specifically in the provision.
 
 
 15
 Indeed, every appellate court to address this issue has supported the Secretary's present position. Carraway Methodist Hospital Center v. Heckler, 753 F.2d 1006, 1009-10 (11th Cir.1985) (SCUs must be "substantially the same"); NKC, Inc. v. Secretary of Health & Human Services, 747 F.2d 1100, 1101-02 (6th Cir.1984) ("same level of care"), cert. denied, --- U.S. ----, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985); St. Elizabeth's Hospital of Boston v. Secretary of Health & Human Services, 746 F.2d 918, 919 (1st Cir.1984) (per curiam) (comparisons may be used as guidance); Lexington County Hospital v. Schweiker, 740 F.2d 287, 290 (4th Cir.1984) ("special care status was reserved for units that were equivalent to an intensive care unit."); Villa View Community Hospital, Inc. v. Heckler, 728 F.2d 539, 541 (D.C.Cir.1984 (per curiam) (care is "similar"); Community Hospital of Indianapolis v. Schweiker, 717 F.2d 372, 376 (7th Cir.1983) (care need not be identical but should be comparable); Sun Towers, Inc. v. Schweiker, 694 F.2d 1036, 1038 (5th Cir.1983) (comparison is permissible).
 
 
 16
 In sum, the Secretary's interpretation is reasonable and the district court erred in rejecting it and imposing the court's own view. Further, public policy favors consistent, nationwide application of rules in social welfare programs, and thus this Court should be reluctant to contradict the unanimous position of other circuits. Finally, Congress itself gave the Secretary broad discretion to determine the reasonable cost of provided services, and it cannot be said that the agency's practice is at odds with this directive.
 
 II.
 
 17
 The hospital argues that even if its Maxicare Unit must be compared with its recognized SCU, the intensive care unit, the Secretary's finding of an unfavorable comparison is not supported by substantial evidence. 5 U.S.C. Sec. 706(2)(E) (1982).
 
 
 18
 According to the hospital, its MCU provided care in 1980 that was extraordinary, concentrated and continuous within the Secretary's definition, in that it was identical to that offered in the ICU. The units were housed next to each other, and apart from the routine care areas of the hospital. Patients in need of constant and strict medical supervision were admitted to the units interchangeably unless they required one of two specialized procedures. Specialized emergency equipment and medication were available to both units and were also used interchangeably. Nurses received the same specialized training for critical care and could serve in either unit. Further, the same severe restrictions on activities and possessions applied to patients in both units.
 
 
 19
 The hospital also points to certain statistics to support its case. It notes that over 90% of MCU patients were transferred to routine care before being discharged from the hospital, suggesting that the MCU served only critically ill persons. In addition, the average stays in the ICU and MCU in 1980 were comparable (ICU, 27.6 days; MCU, 24.57 days; routine, 7.19 days). While not all of the 19 beds in the MCU could be viewed from a central nursing station, as was possible in the 10-bed ICU, nearly every occupied MCU bed was monitored continuously by telemetry equipment.[4]
 
 
 20
 Moreover, the hospital refers to the fact that the MCU met all SCU requirements established by the Joint Commission on the Accreditation of Hospitals, and that the state approved an SCU designation under a regulation almost identical to the federal provision. Finally, two experts--the hospital's Critical Care Division nursing director, and a private physician experienced in critical care--testified that the units were essentially identical.
 
 
 21
 Despite this evidence, the Deputy Administrator stressed differences between the MCU and ICU. He declared:
 
 
 22
 The Provider asserts that, except for two specialized procedures, patients were admitted interchangeably to the MCU or ICU. The Deputy Administrator believes that this assertion is a subjective conclusion of the provider's witnesses, which does not appear to be supported by objective observations such as nurse-to-patient ratio, per diem costs, and patient transfer statistics.
 
 
 23
 The ratio of patient hours to nursing hours was as follows:
ICU 1.49 to 1
MCU 2.17 to 1
Routine 4.83 to 1
 The costs per patient day were:
ICU $271.67
MCU 153.09
Routine 92.25
 
 
 24
 As for patient transfers, records indicate that 30% of all MCU admissions were patients from the ICU and that 45% of all patients discharged by the ICU entered the MCU. According to the Secretary, all of these statistics indicate that care in the MCU was less intensive, and that the MCU served as a "step-down unit" providing intermediate care.
 
 
 25
 This record would appear to provide substantial evidence supporting the Secretary's ruling, given the judicial deference to be accorded to her authority. Although the intensity of care in the MCU is closer to that offered in the ICU than that provided elsewhere in the hospital, there is a clear distinction between the two units. The 77% increase in costs per day in the ICU as compared to the MCU is especially persuasive, so the Court will defer to the Secretary's medical expertise.
 
 
 26
 The hospital itself did not argue or produce witnesses who testified that the difference in these statistics is irrelevant. Instead, it insisted, and the district court agreed, that other factors explain the discrepancies.
 
 
 27
 There was greater staffing of nurses in the ICU, maintains the hospital, because nurses there were on 24-hour call for cardiac emergencies throughout the hospital. In addition, two specialized procedures--arterial pressure monitoring and insertion of temporary cardiac pacemakers--were performed only in the ICU and required the services of three nurses for up to an hour.[5]
 
 
 28
 The costs were higher in the ICU, the hospital asserts, because of the special procedures,[6] and because each bed in the ICU occupied more space than an MCU bed and was therefore assigned a higher proportion of the hospital's capital costs. The hospital also claims that transfers were made from the ICU to the MCU not because the standard of care was different, but in order to make room in the ICU for patients requiring special procedures. In addition, patients were transferred from intensive care in order to provide a psychological boost.
 
 
 29
 No evidence in the record, however, supports any of these contentions. In civil litigation, the burden of proving a fact generally rests with the party asserting its existence. This is especially true where the material necessary to buttress the proposition lies particularly within the knowledge of that party. See Nader v. Allegheny Airlines, 512 F.2d 527, 538 (D.C.Cir.1975), rev'd on other grounds, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). Here, the hospital's assertions are based on empirical data, but it has provided no statistical corroboration and has relied simply on the testimony of its medical staff. Consequently, the hospital's proffer is insufficient to meet its burden.
 
 
 30
 The record presented to the Provider Reimbursement Review Board contains no evidence showing that the difference between nurse/patient ratios in the MCU and in the ICU is attributable to the ICU nurses' duties elsewhere in the hospital or in the special procedures. Notably, there are no documents showing how many patients receive the special procedures or their cost, so the hospital's claims concerning patient costs and transfers cannot be verified. Further, although the record contains several hundred pages of financial records and other data, it is not possible to determine from them how much of the cost differential is owing to the different size of the units. Nothing in the record explains how costs are apportioned on the basis of square footage, and indeed there is little data showing the assignment of costs to the MCU.
 
 
 31
 Thus, the hospital has not met its burden, and on this record the Secretary's conclusion is supported by substantial evidence.
 
 IV.
 
 32
 The district court impermissibly made its own assessment that the MCU met the regulatory definition, and forgave the hospital for statistical differences between the MCU and ICU by accepting its testimony concerning proof not in the record. These rulings were clearly erroneous. The judgment therefore will be vacated and the case remanded with instructions to enter summary judgment in favor of the Secretary.
 
 
 
 [1]
 The reimbursement aspect of Medicare disbursements has been abandoned for post-1983 cost years. The Secretary now makes "prospective payment" for reasonable costs based on patient diagnoses, rather than the costs actually incurred by providers. See 42 U.S.C. Sec. 1395ww (West 1983). This new statutory scheme is not at issue in the present appeal
 
 
 [2]
 Only the 1980 cost year is before the Court. The SCU regulation was amended shortly thereafter, and the hospital concedes that its MCU does not qualify for the subsequent years
 
 
 [3]
 Plaintiff argues that since the Secretary recognized the MCU as an SCU until the 1980 cost year, the administrative position in this record is not entitled to deference. But an agency is entitled to change course, and as long as it adequately explains its new position that view will be accorded deference. Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 42-43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983); Texas v. United States, 756 F.2d 419, 427 (5th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985)
 
 
 [4]
 Twelve beds had such equipment, and the average MCU occupancy was 13.5 beds
 
 
 [5]
 Plaintiff's expert Dr. Jay Paul said the procedures "tie up two or three nurses in intensive care for as much as an hour at a time."
 
 
 [6]
 Nursing Director Jeanne Graff testified that the hospital now charges patients separately for these procedures, but she did not specify the charges