MONSOUR MEDICAL CENTER, a non-profit organization, Appellant/Cross-Appellee,

v.

Margaret HECKLER, Secretary of the Department of Health and Human Services, and Carolyne K. Davis, Administrator, Health Care Financing Administration, Appellees/Cross-Appellants.

### Appeal of MONSOUR MEDICAL CENTER.

### Nos. 86–3168, 86–3191.

United States Court of Appeals, Third Circuit.

Argued Oct. 28, 1986.

Decided Dec. 5, 1986.

As Amended Dec. 18, 1986.

Rehearing and Rehearing En Banc Denied Jan. 6, 1987.

---

Robert O. Lampl, Pittsburgh, Pa., R. Stan Mortenson, David O. Stewart (argued), Miller, Cassidy, Larroca and Lewin, Washington, D.C., for appellant/cross-appellee.

J. Alan Johnson, Albert W. Schollaert, U.S. Atty's Office, W.D.Pa., Pittsburgh, Pa., Beverly Dennis, III, James C. Newman, James S. Feight, Jr. (argued), DHHS–OGC III, Philadelphia, Pa., for appellees/cross-appellants.

Before ADAMS and HIGGINBOTHAM, Circuit Judges, and GARTH, Senior Circuit Judge.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

These two appeals consider the proper treatment under the Medicare Act of interest and depreciation costs incurred by a health care provider in converting from for-profit to non-profit legal status, in providing hospital food services, and in operating a hospital snack bar. The district court, in an unpublished opinion,[1] entered summary judgment for appellant, the Monsour Medical Center ("Center") on the "conversion costs" issue. It found that the Provider Reimbursement Review Board ("PRRB" or "Board") decision denying reimbursement for these costs[2] was not supported by substantial evidence on the record, and remanded the matter to the PRRB "with instructions to properly reimburse [appellant] for these costs." Cross-Appellant, the Secretary of Health and Human Services ("Secretary"), appeals from this judgment. We will direct that the district court's award of summary judgment on this issue to the Center be vacated and that summary judgment be entered in favor of the Secretary. The district court also entered summary judgments for the Secretary, finding that the PRRB's deci-

---

1. *Monsour Medical Center v. Heckler,* No. 84–1938 (W.D.Pa. Dec. 30, 1985).

2. *Monsour Medical Center v. Blue Cross & Blue Shield Ass'n/Blue Cross of W. Pa.,* PRRB Hearing Dec. No. 80–24 (June 14, 1984).

sions allocating certain dietary costs to the Center's nonreimbursable snack bar and denying reimbursement for employee snack bar meals were supported by substantial evidence. The Center appeals from these judgments. We will affirm these summary judgments of the district court.

## FACTUAL BACKGROUND

This complicated story began, for our purposes, with the establishment in 1952 of a private hospital, the Monsour Hospital and Clinic, Inc. of Jeanette, Pennsylvania. The founders and sole shareholders of this Pennsylvania for-profit corporation were three brothers, Doctors Howard, Robert and Roy Monsour, and their parents. A fourth brother, Doctor William Monsour, became involved in this corporation at a later date. In 1966, subsequent to the passage of Title XVIII of the Social Security Act, 79 Stat. 291, as amended, 42 U.S.C. § 1395 *et seq.* (1982), commonly known as the Medicare Act, Robert, Roy and William Monsour, their mother, Eva Monsour, and their cousin, Doctor Omar Ayoub, created the Monsour Medical Foundation ("Foundation"), a Pennsylvania non-profit corporation. Their plan, soon realized, was for the Foundation to assume control of the hospital. On May 17, 1975, these five Monsour family members, who at that time owned all of the Monsour Hospital and Clinic stock, together sold 3.5 percent of this stock in their hospital to the Foundation for $500,000. At or about the same time, the family members donated an additional 46.7 percent of their outstanding stock, valued

at $7,064,765, to the Foundation.[3] The hospital then redeemed the remaining 49.8 percent of its outstanding stock from these Monsour family members by signing a fifteen-year installment note of $7.5 million. Interest due on this note was, after the first five years,[4] pegged to the prime rate,[5] and the note was secured by a second mortgage on the hospital's real estate holdings. These three transactions, which left the Foundation as the sole stockholder in the hospital and the five Monsour family members as its mortgagees, constituted the financial aspects of the conversion. The hospital, now owned by the Foundation, was subsequently reorganized as a Pennsylvania non-profit corporation and renamed the Monsour Medical Center.

In addition to these financial complexities, this case also involves a web of corporate governing bodies. As the incorporators of and stockholders in the original for-profit hospital, the Monsour brothers sat on its corporate board and served as its corporate officers. Prior to the May, 1975 stock sale, donation and redemption, they resigned. The Foundation, at the May 19, 1975 meeting where it approved the conversion, appointed a new hospital board and slate of officers consisting of no Monsour family members. In addition, five family members (Howard, Robert, Roy and William Monsour, and Ayoub) were the Foundation's original trustees, and they appointed the eight additional trustees who served with them as the Foundation Board of Directors. This Board subsequently created a six-member Executive Committee to over-

3. There is some dispute between the parties as to the precise value of the hospital at the time of the conversion. A 1974 appraisal, commissioned by the hospital, valued its assets at $18 million. In 1977, a second appraisal put a market value of $6,419,500 on the real estate holdings of the Monsour Medical Center as of May 21, 1975. At a subsequent meeting with representatives of Blue Cross and Blue Shield of Western Pennsylvania, the Center accepted a valuation of $8.2 million as a basis for asset depreciation under Medicare. Although the Center now claims that the $8.2 million figure was "arbitrarily selected," Letter Brief of Appellant at 9 (Nov. 3, 1986), the record indicates that it is highly probative of what the stockholding

members of the Monsour family actually were— and, more important, what they actually were *not*—"giving away" in the course of the 1975 conversion.

4. During the first five years of this note, the hospital made annual payments, including principal and interest at the rate of six percent, of more than $644,000.

5. When interest rates exploded in the inflationary economy of the late 1970s, the hospital's monthly interest obligation under this note at various times doubled and even tripled from the amounts it had previously been paying.

see operations of both the Foundation and the Center.

For the hospital cost years in issue here, Blue Cross and Blue Shield of Western Pennsylvania ("Blue Cross") served as the government's fiscal intermediary under the Medicare program.[6] Until April, 1981, Blue Cross reimbursed the Center for the conversion-related interest and depreciation expenses; at that time, Blue Cross disallowed reimbursement for these expenses and reclaimed all such expenses it had previously paid to the Center, claiming that the conversion had not been an arm's length transaction between unrelated parties. The Secretary subsequently invoked this same reason for disallowing, in December, 1981, the reimbursement of appellant's conversion-related expenses. Appellant maintains that these actions affect "$2,117,842 in previously-reimbursed depreciation and interest expenses [for fiscal years 1977–1980] ... [and] $1,560,482 in depreciation and interest expenses for [fiscal year] 1981." Brief for Appellant at 13.

As a result, these actions in 1981 "reduced Medicare reimbursement to the [Center] by approximately $1,381,000." Id. [7]

Blue Cross, seeking both recovery of damages in the amount of its previous reimbursements for what it subsequently determined were not reimbursable costs and a declaratory judgment that the Center's conversion costs were as a matter of law not reimbursable under Medicare, sued the Center, the Monsour brothers and the Monsour Hospital and Clinic, Inc., the former owner of the Center, in Pennsylvania state court in 1982. These defendants filed counterclaims against Blue Cross seeking damages for defamation and a declaration that the conversion costs *were* reimbursable as a matter of law. After a three-week bench trial, the state court[8] declared in 1983 for the defendants that, because the hospital sale involved unrelated parties,[9] the conversion costs were reimbursable under the Medicare program through Blue Cross, the intermediary. *Blue Cross of W.*

6. Pursuant to contracts with the Secretary, such intermediaries provide reimbursement to Medicare service providers. *See generally* 42 U.S.C. § 1395h (1982 & Supp. II 1984 & Supp. III 1985). "As part of the[ir] fiscal responsibilities, these intermediaries [we]re required to ascertain the amount of reimbursement [that] accurately reflect[ed] the 'reasonable cost' of the Medicare services provided by an eligible health care institution. A final calculation as to reimbursable costs [wa]s made annually, at the close of the provider's fiscal year, and [wa]s based upon a 'cost report' that each provider [wa]s required to file. 42 C.F.R. § 405.–406(b)." *Northwest Hospital, Inc. v. Hospital Service Corp.*, 687 F.2d 985, 986 (7th Cir.1982).

For post–1983 cost years, this retrospective reimbursement system has been replaced by "'prospective payment' for reasonable costs based on patient diagnoses." *Butler County Memorial Hospital v. Heckler*, 780 F.2d 352, 354 n. 1 (3d Cir.1985). *See also Washington Hospital Center v. Bowen*, 795 F.2d 139, 141–42 (D.C.Cir. 1986).

7. The record does not clarify the basis for some of these figures. Nothing in our opinion turns on their precise magnitudes, however; we quote appellant's brief merely to convey a general flavor of the stakes in this dispute.

The precise facts concerning the intermediary's treatment of the food service and snack bar costs are wholly distinct from its treatment of the conversion costs and the litigation that

ensued. They will therefore be set forth *infra,* in our review of the district court's determination of the propriety of the PRRB's holdings on those separate issues.

8. Hon. Martin I. Wekselman, Court of Common Pleas of Allegheny County, Pennsylvania.

9. The state court found that,

[i]n essence, there [wa]s no evidence in this case from which [it could] find that the members of the [Foundation and hospital] Boards were in any way beholding to the Monsours by virtue of prior social, business or family relationships with them, and the fact of such relationships [wa]s insufficient alone or in combination with any or all of the other evidence in the case to support a finding such as that contended for by Blue Cross.

*Blue Cross of W. Pa. v. Monsour Medical Center,* No. GD 82–4968, at 33 (Pa.Ct. Common Pleas Feb. 2, 1983); Appellant's App. at A38. Its inquiry was focused upon the relationship between the Monsours and the Foundation since the conversion, however, and did not address the degree of control that was present in May, 1975. *See, e.g., id.* at 31; Appellant's App. at A36 (finding "as a fact from the evidence that *subsequent to the conversion,* control of the Foundation was in the Foundation Board and control of the hospital was in the hospital Board and that such control *remains*") (emphases added).

*Pa. v. Monsour Medical Center,* No. GD 82–4968 (Pa.Ct. Common Pleas Feb. 2, 1983).[10] Following the state court decision, the Secretary continued to disallow reimbursement for the Center's conversion-related costs. The Center then challenged the Secretary's refusal to reimburse by filing a complaint with the PRRB. On October 6 and 7, 1983, a PRRB hearing was held, as provided by statute, *see* 42 U.S.C. § 1395*oo*(a) (Supp. III 1985), to assess the Center's contentions on six distinct Medicare reimbursement issues. The PRRB found, *inter alia,* that the Foundation trustees who approved the conversion transactions

> were acting as surrogates of the [Monsour] family to implement the final stages of a corporate long-term plan [that] had been adopted by the Foundation in a prior period when it was controlled by the Monsour family.... There is no question that the Family, the Foundation, and the [hospital] were related when the entire transaction was specifically planned. The fact that the transaction was executed almost precisely as planned demonstrates the continuation of substantial control in fact.

*Monsour Medical Center v. Blue Cross & Blue Shield Ass'n/Blue Cross of W. Pa.,* PRRB Hearing Dec. No. 80–24, at 20 (June 14, 1984); Appellant's App. at A64. This June 14, 1984 PRRB decision[11] was subsequently adopted by the Secretary, and the Center appealed the Board's adverse determinations to the district court.

## DISCUSSION

■ Federal court jurisdiction to review a final decision of the PRRB affirmed by the Secretary is conferred by 42 U.S.C. § 1395*oo*(f)(1) (Supp. III 1985). Under the express terms of the Administrative Procedure Act ("A.P.A."), 5 U.S.C. §§ 551–59 & 701–06 (1982), the "action, findings, and conclusions" of such "an agency hearing provided by statute" are to be held "unlawful and set aside" by the reviewing court if they are "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E) (1982). "In making the foregoing determinations, the court shall review the whole record...." *Id. Accord* 42 U.S.C. § 405 (1982) ("The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive....").

We are, in effect, the second "appellate" court to consider the factual bases of PRRB's challenged findings. Our review applies, as did the district court's, the substantial evidence test. In an attempt to clarify the practical meaning of this test, we set forth the oft-quoted language of the Supreme Court:

> "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ... Accordingly, it "must do more than create a suspicion of the existence of the fact to be established.... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

*Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (citations omitted). *See also D & D Distribution Co. v. NLRB,* 801 F.2d 636, 638 (3d Cir.1986). The test

> requir[es] that the evidence be "substantial" after the reviewing court takes into account "whatever in the record [fairly] detracts from its weight." Thus, the evidence must be sufficient to support the conclusion of a reasonable person after considering the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding.

R. Pierce, S. Shapiro & P. Verkuil, *Administrative Law & Process* 358–59 (1985) (quoting *Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 465). Overall, this test is deferential, and we grant similar deference

---

**10.** This decision was affirmed without opinion. *See Blue Cross v. Monsour Medical,* 341 Pa.Super. 610, 491 A.2d 914 (1985).

**11.** *See supra* note 2.

to agency inferences from facts if those inferences are supported by substantial evidence, "even [where] this court acting *de novo* might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB,* 804 F.2d 808, 812 (3d Cir.1986) (citations omitted). Our review of an agency's interpretation of legal precepts, as demonstrated by its application of such precepts to the facts, is, of course, plenary. *See D & D Distribution Co.,* 801 F.2d at 638 (citing *Allbritton Communications Co. v. NLRB,* 766 F.2d 812, 817 (3d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 850, 88 L.Ed.2d 891 (1986)). The Court's role in conducting such review "is not to impose its own interpretation of the ... regulation, but instead to defer to [an agency's] position so long as it is reasonable." *Butler County Memorial Hosp. v. Heckler,* 780 F.2d 352, 355 (3d Cir.1985) (citing *Presinzano v. Hoffman-La Roche, Inc.,* 726 F.2d 105, 111 (3d Cir.1984)). In sum, so long as an agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings of fact.[12]

### A. *Conversion Costs*

Appellant Monsour Medical Center seeks Medicare reimbursement for the sizable interest expenses it incurred pursuant to its 1975 mortgage agreement with members of the Monsour family. It also seeks Medicare reimbursement, at a "stepped up" ba-

sis that reflects the price at which it purchased the hospital from Monsour family members in 1975, for its depreciation expenses since the conversion. The district court granted the Center's motion for summary judgment on these issues, and the Secretary, as cross-appellant, now appeals from that portion of the district court's order. At issue in this cross-appeal are reimbursement claims dating back to fiscal year 1977. To assess the validity of the PRRB's treatment of these claims, we turn first to the applicable federal regulations.

According to the Medicare regulations, a health care provider's interest expenses are an allowable cost (i.e., reimbursable) if they are "paid to a lender not related through control or ownership, or personal relationship to the borrowing organization." 42 C.F.R. § 405.419(b)(3)(ii) (1985). As to determining the proper cost basis of a provider (i.e., the purchase price figure from which its depreciation costs are to be calculated), the regulations provide that, "[i]f the purchaser cannot demonstrate that the sale was bona fide, ... [its] cost basis shall not exceed the seller's cost basis, less accumulated depreciation."[13] 42 C.F.R. § 405.-415(g)(3) (1985). For both determinations,[14] the crucial inquiry concerns the relationship between the Foundation and the Monsour family (i.e., the buyer and the seller of the hospital facility). The "related organizations" provision, 42 C.F.R. § 405.427 (1985),[15] which provides for the allowance

---

**12.** In this regard, a reviewing court must be careful not to let its policy views as to the merits of a particular regulatory interpretation affect the stringency of the substantial evidence test it applies to the factual findings of an agency advancing such an interpretation. Placing such a judicial "thumb" on the reviewing "scale" would exceed the proper appellate role delineated by the A.P.A.

**13.** While this regulation offers no definition of a "bona fide" sale, another of its subparts does refer to the definition of "a transaction between related organizations, as defined in § 405.427 ..." 42 C.F.R. § 405.415(d)(3)(ii)(A) (1985). Without additional guidance from Congress or the relevant agency, we thus feel constrained to assume—and reasonable in assuming—that a bona fide sale for purposes of determining the

cost basis of a Medicare provider is one transacted between organizations that are not "related" under § 405.427.

**14.** *See supra* note 13.

**15.** As courts have previously noted, this regulation "serves to screen out both costs not actually incurred and unreasonable costs. That is to say, the regulation precludes reimbursement for cost increases due solely to transactions between different parts of a single economic unit, and it polices 'sweetheart' contracts with suppliers that may inflate costs to the provider." *Medical Center of Independence v. Harris,* 628 F.2d 1113, 1119 (8th Cir.1980). *See also Fairfax Hosp. Ass'n, Inc. v. Mathews,* 459 F.Supp. 429, 433 (E.D.Va.1977) (the regulation "merely denies a double profit to a firm which is, in effect,

of certain costs incurred by a provider's "relatives," offers these definitions of "organizations related to the provider by common ownership or control:"

> (b) *Definitions*—(1) *Related to provider.* Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.
>
> (2) *Common ownership.* Common ownership exists when an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.
>
> (3) *Control.* Control exists where an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

*Id.* Applying this precise definition of "control" as the governing legal precept in this matter, we will hold that substantial evidence on the record supported the PRRB's finding that the Foundation and the Monsour family were related parties at the time of the conversion.

### 1. *The Governing Legal Precepts*

The PRRB and the district court, in their respective analyses of these reimbursement issues, disagreed fundamentally on the proper application of the relevant Medicare regulations. In assessing the "relatedness" of the Monsour family and the Foundation, the Board looked to "the corporate long-term planning period." [16] *Monsour Medical Center v. Blue Cross & Blue Shield Ass'n/Blue Cross of W. Pa.,*

PRRB Hearing Dec. No. 80–24, at 20 (June 14, 1984); Appellant's App. at A64. The district court, by contrast, believed that focusing on that earlier time period "beg[ged] the issue, i.e., whether the Monsours continued to control the Center *after* the sale." *Monsour Medical Center v. Heckler,* No. 84–1938, at 11 (W.D.Pa. Dec. 30, 1985); Appellant's App. at A79. Although the regulations—like the analyses of this issue by both the PRRB and the district court—lack ideal clarity, we will accept the PRRB's interpretation of them.

The regulation governing depreciation, although it does not speak of control or relatedness,[17] requires a purchaser of a care providing facility to demonstrate "that the sale was bona fide." 42 C.F.R. § 405.-415(g)(3) (1985). We interpret this regulation as addressing the "bona fides" of a sale *at the time of that sale.* The regulation governing interest costs "paid to a lender ... [by] the borrowing organization" does speak of "control," "personal relationship" and "related[ness]." 42 C.F.R. § 405.419(b)(3)(ii) (1985). We interpret this regulation as addressing, though less clearly than the previous regulation, the "control," "personal relationship" and "related[ness]" of parties to a loan *at the time of their borrowing and lending.* So far as we can ascertain from its hearing decision, these were and are the PRRB's interpretations of its governing regulations.[18] As a reviewing court constrained by the A.P.A., "[w]e must ... accept the agency's view so long as the 'interpretation[s are] within the range of reasonable meanings that the words of the regula-

---

dealing with itself"), *aff'd sub nom. Fairfax Hosp. Ass'n, Inc. v. Califano,* 585 F.2d 602 (4th Cir.1978). Other Medicare regulations that have imported the definitions of § 405.427(b), such as those at issue in this cross-appeal, seek to prevent the potentially huge payoffs that could otherwise result from a care provider's self-dealing.

While this appeal was pending, this provision was recodified at 42 C.F.R. § 413.17. *See* 51 Fed.Reg. 34, 797–98 (1986).

16. This period covers roughly the years 1969–1975, the time it took the Foundation to realize

its goal of purchasing the Monsour Health Center.

17. *See supra* note 13.

18. *See, e.g., Medical Center of Independence,* 628 F.2d at 1116 ("The PRRB[, applying 42 C.F.R. § 405.427 (1979),] ... conclud[ed] that [the care provider] had introduced substantial evidence that it and [the organization to which the provider paid interest, rent and management fees] were not related *at the time that they entered into their agreement....*") (emphasis added).

tion[s] admit.'"[19] *Butler County Memorial Hospital,* 780 F.2d at 355–56 (quoting *Psychiatric Institute of Washington, D.C., Inc. v. Schweiker,* 669 F.2d 812, 813–14 (D.C.Cir.1981) (per curiam)).[20] Based on our own reading of the regulatory language, we conclude that the Secretary's apparent interpretations are plainly reasonable. In these circumstances, where there is no evidence that accepting the Secretary's interpretive expertise will actually "shield an irrational decision-making process," *Natural Resources Defense Council, Inc. v. EPA,* 790 F.2d 289, 298 (3d Cir.1986), or "work[ ] an unduly harsh result in the name of an otherwise valid and laudable regulation," *Hart v. Bowen,* 799 F.2d 567, 570 (9th Cir.1986), there is no

basis for second-guessing the agency. The district court therefore erred as a matter of law in replacing these interpretations, which are "completely within the range of reasonable meanings [that] may logically ... be drawn from the words of the regulation[s]," *Garner v. United States Office of Personnel Management,* 633 F.Supp. 995, 999 (E.D.Pa.1986), with its own views.

### 2. *Substantial Evidence Review*

We now address the question the district court did not reach:[21] Was the PRRB's finding that the Monsour family and the Foundation—the seller and the buyer—were related parties at the time of the 1975 conversion[22] based on substantial evi-

**19.** Even when an agency is in some sense "guilty" of promulgating ambiguous regulations, we nonetheless defer to its reasonable interpretations of them. *See Modine Mfg. Corp. v. Kay,* 791 F.2d 267, 273–74 (3d Cir.1986).

**20.** *See also United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) ("We need not tarry ... over the various ambiguous terms and complex interrelations of the [Defense Department] regulations. In construing administrative regulations, 'the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'") (quoting *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)); *United States v. Hescorp, Heavy Equipment Sales Corp.,* 801 F.2d 70, 76 (2d Cir.) (the views of the administering agency "are entitled to substantial deference[,] ... especially [where that agency] participated in developing the subject [r]egulations"), *cert. denied,* — U.S. —, 107 S.Ct. 672, 93 L.Ed.2d 723 (1986); *Grier v. Secretary of Army,* 799 F.2d 721, 725–26 (11th Cir.1986) ("As this agency interpretation is not at odds with the text of the regulation, or plainly erroneous, it is entitled to great deference by this court."); *United Transportation Union v. Dole,* 797 F.2d 823, 828 (10th Cir.1986); *Sioux Valley Hosp. v. Bowen,* 792 F.2d 715, 719 (8th Cir.1986); *accord Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965) (interpreting executive orders) ("The Secretary's interpretation[s] may not be the only one[s] permitted by the language of the [regulations], but [they are] quite clearly ... reasonable interpretation[s]; courts must therefore respect [them].") (citing *Bowles,* 325 U.S. at 413–14, 65 S.Ct. at 1217, and *McLaren v. Fleischer,* 256 U.S. 477, 481, 41 S.Ct. 577, 578, 65 L.Ed. 1052 (1921)); *Wheeler v. Heckler,* 787 F.2d

101, 104 (3d Cir.1986) ("because Congress had delegated to the Secretary the responsibility for administering ... complex [Social Security] programs, we must defer to her [statutory] construction, as long as it is reasonable and not arbitrary and capricious"); *cf. Lugo v. Schweiker,* 776 F.2d 1143, 1148 (3d Cir.1985) (where a statute does not indicate what Congress intended, that "this Court must defer to the secretary's reasonable interpretation ... [is a] basic principle of administrative law and statutory construction"); *Chrobak v. Metro. Life Ins. Co.,* 517 F.2d 883, 886 (7th Cir.1975) (words should be given their ordinary meaning, "particularly ... [when they] are found in a promulgated governmental regulation"); *Garner v. United States Office of Personnel Management,* 633 F.Supp. 995, 999 (E.D.Pa.1986) ("the [degree of] deference a court should give to an agency's construction[s] of its regulations ... is directly proportional to the complexity of the statutes and regulations involved based upon the expertise developed by the agency in administering [them]").

**21.** Based on its erroneous interpretations of the government regulations, the district court, in its analysis and in its extensive quotations from Judge Wekselman's state court opinion, addressed the question whether members of the Monsour family and the Foundation have been related parties *since* the date of the conversion. *See, e.g., Monsour Center v. Heckler,* No. 84–1938, at 8–11 (W.D.Pa. Dec. 30, 1985); Appellant's App. at A76–A79.

**22.** On its way to reaching this conclusion, the Board offered the following syllogism:

The Monsour family and the Foundation (both its board and its trustees) were related parties at the time the conversion was planned (roughly 1969–1974). In 1975, the

dence?[23] We answer this question unequivocally and in the affirmative.

■ The Medicare statute defines related organizations in terms of "control," which "exists where an individual or an organization has the power, directly *or indirectly*, significantly to influence or direct the actions or policies of an organization or institution." 42 C.F.R. § 405.427(b)(3) (1985) (emphasis added). Virtually all the factual evidence in the record before the PRRB establishes that the creation of the Foundation, the selection of its board members and trustees, and the financial transactions that effectuated the hospital conversion all proceeded according to the plans of, and were executed by, the members of the Monsour family who were the hospital's original (and only) stockholders. The record indicates that they planned a series of transactions that would produce for them financial benefits far exceeding the real value of the hospital they were selling to the Foundation.[24] The record also indicates that the Monsour family members, after setting the terms of the conversion, expanded the Foundation they had created by adding eight new members appointed for the purpose of approving the conversion; in fact, while the four Monsours abstained from voting, this new, "non-Monsour" majority Foundation did approve every aspect of the proposed conversion. The record thus indicates that the conversion went exactly as the Monsour family

members, as both the selling stockholders and the buying Foundation, had planned. Complicated organizational and financial structures simply cannot conceal or negate such substantial record evidence of the Monsours' direct power significantly to influence the actions or policies of the Foundation at the time of the conversion.[25] While the substantial evidence just described is sufficient to demonstrate direct power to control, it in addition—and without question—demonstrates that the Monsour family at least had the *indirect* power, referred to in the regulations, "significantly to influence or direct the actions or policies" of the Foundation at the time of the conversion. 42 C.F.R. § 405.427(b)(3) (1985). The district court erred in finding otherwise. It looked only at events subsequent to the conversion, and it appears simply to have ignored the PRRB's finding that the precise facts of the conversion itself, because it was carried out as planned when the Monsours *were* the Foundation, were powerful and substantial evidence of the Monsour's continuing power to influence the Foundation at the time in question. We will therefore vacate the district court's summary judgment for the Center as to the conversion costs and order that the district court enter summary judgment for the Secretary on this issue.

### 3. Collateral Estoppel

In the state court action involving Blue Cross and the Center, Judge Wekselman

---

conversion went exactly as they had previously planned. Therefore, they must have been related parties at the time of the conversion. *See Monsour Medical v. Blue Cross & Blue Shield Ass'n/Blue Cross of W. Pa.*, PRRB Hearing Dec. No. 80–24, at 20 (June 14, 1984); Appellant's App. at A64. This analysis assumes, of course, that relatedness is essential to a conversion occurring as it has been planned. We look to the record evidence on which the Board based its finding, without assessing the logical validity of this syllogistic "explanation."

23. Because we conclude that the PRRB's determination was based upon substantial evidence, we do not address the validity of what the district court—correctly, as we read the PRRB's decision—took to be the PRRB's "alternative basis" for disallowing reimbursement of the Center's interest costs: the assertion that costs

incurred purchasing stock that is not related to patient care are not reimbursable. *See Monsour Medical Center v. Blue Cross & Blue Shield Ass'n/Blue Cross of W. Pa.*, PRRB Hearing Dec. No. 80–24, at 21 (June 14, 1984); Appellant's App. at A65.

24. *See supra* note 3.

25. In reaching the opposite conclusion, the district court, like Judge Wekselman in the state court proceeding, apparently gave overwhelming weight to record evidence that since the 1975 conversion Monsour family members have not called the shots in all aspects and areas of the Center. Such evidence, while interesting, is not material to the legal issue before us: the control Monsour family members exercised over the Foundation *at the time of the conversion*.

addressed appellant's claim "that evidence supports a finding that the conversion which occurred in May of 1975 was an arm's length transaction within the guidelines established by the Medicare regulations." [26] *Blue Cross of W. Pa. v. Monsour Medical Center,* No. GD 82–4968, at 7 (Pa.Ct. Common Pleas Feb. 2, 1983); Appellant's App. at A12. He found that,

> [i]n essence, there is no evidence in this case from which the Court can find that the members of the two Boards were in any way beholding to the Monsours by virtue of prior social, business or family relationships with them, and the fact of such relationships is insufficient alone or in combination with any or all of the other evidence in the case to support a finding such as that contended for by Blue Cross.

*Id.* at 33; Appellant's App. at A38. Appellant, as cross-appellee on this issue, urges us, as it urged both the PRRB and the district court, to consider ourselves governed by this state court finding.

 While Blue Cross was a party to the state proceeding, the Secretary was not. Therefore, to estop the federal government from litigating its claims, appellant would have to prove that "the United States exercised control" over Blue Cross's Pennsylvania court suit against the Center. *Montana v. United States,* 440 U.S. 147, 155, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979). In *Montana,* where this question of control by the United States was not in dispute due to stipulations of the United States, *see id.,* the Supreme Court based its

finding that the United States had controlled the prior state suit, and thus was precluded from relitigating the issues that that state suit had settled, on the following indicia:

> [t]he government ...
>
> (1) required the [state] lawsuit to be filed;
>
> (2) reviewed and approved the complaint;
>
> (3) paid the attorneys' fees and costs;
>
> (4) directed the appeal from State District Court to the [State] Supreme Court;
>
> (5) appeared and submitted a brief as *amicus* in the [State] Supreme Court;
>
> (6) directed the filing of a notice of appeal to [the United States Supreme] Court; and
>
> (7) effectuated [the state court plaintiff's] abandonment of that appeal on advice of the Solicitor General.

*Id.* In the state suit that preceded this case, the Secretary played *none* of these controlling roles. The fact that she was sufficiently satisfied with the probative value of the state court proceeding to submit its transcript as evidence in the PRRB hearing does not, at least not without certain proof of the *Montana* indicia just enumerated, prove "plainly [that the Secretary] had a sufficient 'laboring oar' in the conduct of state court litigation to actuate principles of estoppel." [27] *Id.* (quoting *Drummond v. United States,* 324 U.S. 316, 318, 65 S.Ct. 659, 660, 89 L.Ed. 969 (1945)). We therefore agree with the PRRB and the district court [28] that the state court find-

---

**26.** In the state proceeding, the parties agreed "that the Medicare regulations govern the determination of that question and dictate whether the disputed costs are reimbursable by Blue Cross in either of its reimbursing capacities." *Blue Cross of W. Pa. v. Monsour Medical Center,* No. GD 82–4968, at 7 (Pa.Ct. Common Pleas Feb. 2, 1983); Appellant's App. at A12.

**27.** Because plain evidence of Government control is lacking, we do not undertake the further inquiries that would also be required before we could hold the Government estopped by the state court finding, to wit:

> first, whether the issues presented by this litigation are in substance the same as those resolved against the United States in [state

court]; second, whether controlling facts or legal principles have changed significantly since the state-court judgment; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion.

*Montana,* 440 U.S. at 155, 99 S.Ct. at 974–75.

**28.** We note that the district court, while rejecting appellant's collateral estoppel argument, did give Judge Wekselman's state court findings considerable weight in concluding that the PRRB's finding of "relatedness" was not supported by substantial record evidence. In effect, it seems, the district court believed that the government was almost estopped by the prior state court finding, and let this belief guide its

ings in the Blue Cross-Monsour Medical Center suit should not be given legally preclusive effect in this federal action.[29]

### 4. *Equitable Estoppel*

■ Five years passed and actual reimbursement was paid for the Center's conversion costs before Blue Cross audited the Center's cost reports and retroactively disallowed these reimbursements. Appellant contends that the Secretary should therefore be equitably estopped from changing the original course of conduct.

Appellant has failed to carry its sizeable burden of proof on this issue.[30] In *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (*"Crawford County"*), the Supreme Court unanimously rejected a similar claim by a Medicare provider that had benefitted from excessive reimbursements provided by the Secretary's intermediary. Appellant has failed to demonstrate that the denial of reimbursement for the interest and depreciation costs associated with its conversion leaves it "significantly worse off than if it had never obtained" such reimbursement in the first place. *Id.* at 63, 104 S.Ct. at 2225. In fact, like the health care provider in *Craw-*

*ford County,* the Center here has demonstrated no detriment other than its "inability to retain money that [the Secretary has now determined] it should never have received in the first place." *Id.* at 61, 104 S.Ct. at 2225. The core teaching of *Crawford County* is that, in the context "of a complex program such as Medicare," it is simply too much to expect the Government "to ensure that every bit of informal advice given by its agents ... will be sufficiently reliable to justify expenditure of sums of money as substantial as those spent by [appellant]." *Id.* at 64, 104 S.Ct. at 2226. Adhering to that teaching, we find that equitable estoppel of the Secretary is not justified on the facts of this case.

### B. *Dietary Cost Reclassification*

In its Medicare cost reports filed with Blue Cross for fiscal year 1980, the Monsour Medical Center correctly treated its dietary costs (including its employee cafeteria) and its snack bar costs as separate "cost centers." Appellant's cost report claimed the snack bar as a non-reimbursable cost center. Blue Cross subsequently audited the report and discovered that some nonreimbursable snack bar costs had been reported in the reimbursable die-

substantial evidence review. Such an approach confuses distinct legal analyses in a way that adversely affects the clarity and accuracy of each. Once the district court found that the state court findings should not be given preclusive effect in this case, those findings ceased to be directly relevant to the district court's review of the Board's findings; the fact that the state court, on the basis of some of the same evidence, previously reached an opposite conclusion from the Board's does not as a matter of federal law make the record evidence upon which the Board relied any less substantial in the eyes of a reviewing court.

**29.** Appellant also contends that we are bound by the doctrine of *stare decisis* to respect the state court's determinations. Like the district court, we are not persuaded by this unusual assertion, for *stare decisis* concerns the deference and respect a given court must show *its own* prior decisions or those of its superior(s). *See, e.g., City of Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 419–20 & n. 1, 103 S.Ct. 2481, 2487 & n. 1, 76 L.Ed.2d 687 (1983) (the Supreme Court demonstrating its respect for the doctrine by reaffirming *its* decision in

*Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)); *Horn v. Kean,* 796 F.2d 668, 671 (3d Cir.1986) (in banc) ("the doctrine of *stare decisis* ... requires inferior courts to follow decisions of a superior court").

**30.** We note, but do not rely upon, the recent declaration of eight Supreme Court Justices that it is still only an "assum[ption] that the Government is *ever* subject to estoppel." *Lyng v. Payne,* — U.S. ——, 106 S.Ct. 2333, 2340, 90 L.Ed.2d 921 (1986) (emphasis added). *Cf. id.,* 106 S.Ct. at 2345 n. 2 (Stevens, J., dissenting) ("To its credit, in rejecting the Government's [sic] equitable estoppel argument, the Court belatedly acknowledges that it unnecessarily prolonged this litigation by vacating the first judgment entered by the Court of Appeals in 1983 and remanding for further consideration in light of our [equitable estoppel doctrine] decision in *Heckler v. Community Health Services [of Crawford County, Inc.],* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984)."); *United States v. Locke,* 471 U.S. 84, 105 S.Ct. 1785, 1802, 85 L.Ed.2d 64 (1985) (O'Connor, J., concurring) ("our previous decisions would not necessarily bar application of the doctrine of equitable estoppel").

tary/cafeteria cost center. It thus reclassified those costs to the snack bar cost center (i.e., it refused to reimburse them). It also reopened the Center's cost reports for fiscal years 1977 through 1979 and adjusted them in the same way. Because the Center was unable to verify its claims that its original reports were accurate, Blue Cross made these adjustments in reliance on data provided by an outside contractor who had operated the cafeteria and had ordered, stored and assembled the food that was ultimately transferred to and served by the snack bar.

The Center appealed these reclassification adjustments (approximately $318,000) to the PRRB, which found them to be appropriate. *Monsour Medical Center v. Blue Cross & Blue Shield Ass'n./Blue Cross of W. Pa.*, PRRB Hearing Dec. No. 80–24, at 18 (June 14, 1984); Appellant's App. at A62. The Board found that the Center had failed "to maintain verifiable and auditable financial records and statistical data to support [its] costs claimed," as required by 42 C.F.R. §§ 405.406 and 405.-453 (1985). *Id.* It therefore concluded that Blue Cross's resort to data furnished by the outside contractor was "reasonable and responsible[;] ... [it was] an acceptable alternative in view of the [Center's] deficient ... records." *Id.* The district court concluded that the Board's approval of the cost reclassifications was based upon substantial evidence,[31] and the Center now appeals.

■ We will affirm this portion of the district court's summary judgment order for appellee. The Center disputes the accuracy of the contractor's data, and it has urged this court to consider the Center's own study finding that snack bar meals in fact cost much less than Blue Cross's reclassification indicates, but it has offered no defense of its recordkeeping. Substantial evidence indicates that the Center's records for the years in question do not contain accurate data "in sufficient detail" to support its claims for dietary cost reimbursement. 42 C.F.R. § 405.453(c) (1985).

### C. Snack Bar Meal Costs

Before the PRRB, the Center also challenged Blue Cross's refusal to reimburse its snack bar costs that relate to providing employee meals. The Board upheld this refusal, again basing its decision on the inadequacy of the Center's records to support its reimbursement claims.[32]

■ We will affirm the district court's entry of summary judgment for the Secretary on this issue. We agree with the district court that the record before the Board "[d]id not establish with the required degree of accuracy the snack bar costs attributable to employee meals during the years in question."[33] The Center must bear the cost of its failure to maintain the records required of a Medicare provider.

31. The district court did not analyze this issue independently. Instead, its opinion merged this question with the question whether the Center should be reimbursed for snack bar costs attributable to employee meals. We prefer to treat these questions separately, and have structured this opinion accordingly.

32. The Center did offer the Board a 1981 study of employee snack bar utilization, and urged the Board to use this study data to estimate unrecovered employee meal costs for the prior cost reporting periods at issue. As to 1981, the Board found that the Center's records were inadequate to corroborate the study's conclusion that 65 percent of the snack bar's activity related to employee utilization. The Board also found that—because snack bar revenue and cost statistics varied widely and without explanation from year to year, because the Center's snack bar records were commingled with those of its gift shop for all the years in question, and because 1981 was the first year in which cafeteria and snack bar services were combined after the services of the outside contractor were discontinued—there was no reasonable basis to extrapolate the findings of the 1981 study back to the prior years. *See Monsour Medical Center v. Blue Cross & Blue Shield Ass'n./Blue Cross of W. Pa.*, PRRB Hearing Dec. No. 80–24, at 18 (June 14, 1984); Appellant's App. at A62.

33. We thus become the third court to note that "[t]he hospital's record keeping might most charitably be characterized as chaotic." *Blue Cross of W. Pa. v. Monsour Medical Center*, No. GD 82–4968, at 15 (Pa.Ct. Common Pleas Feb. 2, 1983); Appellant's App. at A20.

## CONCLUSION

On the conversion cost issue, we will vacate the district court's summary judgment for the Center and will direct the district court to enter summary judgment for the Secretary. On the dietary cost center and snack bar meal cost issues, we will affirm the district court's entry of summary judgment for the Secretary.