**UNITED STATES of America, Appellee,**

v.

**HESCORP, HEAVY EQUIPMENT SALES CORPORATION,**
Defendant-Appellant.

**No. 1235, Docket 86–1009.**

United States Court of Appeals,
Second Circuit.

Argued May 5, 1986.
Decided Sept. 11, 1986.

Lawrence S. Robbins, Brooklyn, N.Y., Asst. U.S. Atty. (Reena Raggi, U.S. Atty., E.D.N.Y., Allyne R. Ross, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Jerry Lawrence Siegel, New York City, for defendant-appellant.

Before VAN GRAAFEILAND, KEARSE and MINER, Circuit Judges.

MINER, Circuit Judge:

Hescorp, Heavy Equipment Sales Corporation ("Hescorp") appeals from a judgment of conviction entered upon a conditional guilty plea, Fed.R.Crim.P. 11(a)(2), in the United States District Court for the Eastern District of New York (Sifton, J.). The judgment stems from six shipments of construction equipment and spare parts it made to Iran, by direct and indirect routes, in violation of an Executive Order and

Treasury Regulations imposing an embargo on most exports to Iran. Hescorp contends that the indictment against it should have been dismissed by the district court because the contracts under which it furnished the equipment and spare parts were "service contracts" entered into prior to the effective date of the Regulations and thus were exempt from the Embargo under Treasury Regulation § 535.207(a)(4). It also contends that the Order and Regulations were unconstitutionally vague and that its activities were justified under the doctrine of necessity. Finding these arguments to be without merit, we affirm the convictions.

## I. BACKGROUND

Hescorp, a United States corporation, is a wholly-owned subsidiary of Impregilo, S.p.A. ("Impregilo"), an Italian corporation, and has as its primary business purpose the acquisition of construction equipment and parts, on behalf of Impregilo, for use in Impregilo's construction projects throughout the world. In August of 1974, Impregilo S.p.A. formed a joint venture with the Impregilo & Tessa Construction Corporation ("I & T") and entered into a contract with the Imperial Government of Iran for the construction of a dam on the Lar River ("Lar Dam"). In May of 1975, Hescorp (then known as Impregilo, U.S.A., Inc.) entered into a contract with Impregilo S.p.A. "for the purpose of expediting the acquisition and delivery of equipment, commodities and other goods and services...." Hescorp also entered into a virtually identical contract with I & T for the explicit purpose of assisting I & T in completing the Lar Dam project.

Construction of the Lar Dam commenced in 1974 and was approximately seventy percent complete in February of 1979 when the Islamic Government of Iran, led by the Ayatollah Khomeni, overthrew the government of Dr. Bakhtiar, the last Prime Minister appointed by the Shah. On November 4, 1979, armed militants attacked and seized the United States Embassy in Tehran, taking fifty-two Americans hostage.

Ten days later, President Carter declared a national emergency to deal with the situation in Iran, Executive Order 12170, 44 Fed.Reg. 65729 (Nov. 14, 1979), thus becoming the first President to exercise the sweeping authority granted under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1706 (1982).

In January of 1980, the United States introduced a Draft Resolution in the United Nations Security Council calling on the government of the Islamic Republic of Iran to release the United States hostages and requesting all member states to impose economic sanctions against Iran until such time as the hostages were released. The Draft Resolution prohibited exports to Iran, but contained an exception for the performance of pre-existing service contracts in support of industrial projects in Iran. Richard Gardner, the United States Ambassador to Italy throughout the period of United Nations deliberations, advised the district court that this exception was intended to encompass the shipment of spare parts and equipment to be used in connection with the performance of such service contracts. When the Resolution was put to a vote on January 13, 1980, the result was ten votes in favor, two, including the Soviet Union, against, and two abstentions. Since the Soviet Union, a permanent member of the Security Council, cast a negative vote, the Draft Resolution was defeated.

In April of 1980, the militants controlling the Embassy stated that they were willing to turn the hostages over to the government of Iran. The government refused. This refusal dispelled any remaining doubt that the Islamic Government of Iran was unwilling to act to obtain the release of the hostages. Accordingly, on April 7, 1980, President Carter, under the authority of the IEEPA, issued Executive Order No. 12205, 45 Fed.Reg. 24099, *as amended by*, Exec.Order No. 12211, 45 Fed.Reg. 26685 (Apr. 17, 1980), which imposed a trade embargo on Iran, with certain limited exceptions. A Presidential Statement issued in

conjunction with the Order stated in pertinent part:

It must be made clear that the failure to release the hostages will involve increasingly heavy costs to Iran and its interests. I have today ordered the following steps:

* * * * * *

(2) The Secretary of the Treasury will immediately put into effect official sanctions prohibiting exports from the U.S. to Iran in accordance with the sanctions approved by ten members of the United Nations Security Council on January 13, in the resolution which was vetoed by the Soviet Union.

On April 9, 1980, the Department of the Treasury, through its Office of Foreign Assets Control ("OFAC"), issued regulations implementing the embargo imposed by the Executive Order. These Regulations provided:

§ 535.207 Trade, Shipping and Service Transactions

(a) All of the following transactions are prohibited, except as authorized by means of regulations, rulings, instructions, licenses or otherwise:

(1) The sale, supply or other transfer, by any person subject to the jurisdiction of the United States of any items, commodities or products, except food, medicine or supplies intended strictly for medical purposes, and donations of clothing intended to be used to relieve human suffering, from the United States or from any foreign country, whether or not originating in the United States, either to or destined for Iran, an Iranian governmental entity in Iran, any other person or body in Iran, or any other person or body for the purposes of any enterprise carried on in Iran.

* * * * * *

(4) The engaging, by any person subject to the jurisdiction of the United States, in any service contract in support of industrial projects in Iran, except any such contracts entered into prior to the effective date or concerned with the provision of medical services.

The indictment in the instant case alleged that between April 25, 1980 and November 27, 1980, Hescorp, its president, Giuseppi Monti, Mangili Shipping Corp., and its president, William Barta, made six shipments of construction equipment and spare parts to Iran and to Switzerland, destined for Iran, in violation of the Executive Order and Treasury Regulations. All four defendants moved to dismiss the indictment, Fed.R.Crim.P. 12(b)(2), primarily on the ground that the contracts under which they furnished the equipment and spare parts to Iran were "service contracts" entered into prior to the effective date of the Regulations and thus were exempt from the Embargo under Treasury Regulation § 535.-207(a)(4). Defendants also claimed that the shipments fell within the (a)(1) exception for "food, medicine, or supplies intended strictly for medical purposes ..." or that they were exempt under the doctrine of necessity. Finally, defendants argued that if the regulations prohibited the subject shipments they were unconstitutionally vague.

The district court rejected each of these contentions. Hescorp entered a guilty plea in an agreement preserving its right to appeal the judgment of conviction. Fed.R. Crim.P. 11(a)(2). The remaining three defendants proceeded to trial and were convicted. Mangili's and Barta's convictions are the subject of a separate appeal (No. 86–1094). Monti, who fled the country just prior to trial, was tried in absentia and has not yet been sentenced.

Finding that Hescorp's activities were prohibited by the Iranian Embargo, that the Order and the Regulations were not unconstitutionally vague, and that Hescorp's activities were not justified under the doctrine of necessity, we affirm the conviction in all respects.

## II. DISCUSSION

### A. Service Contract Exception

Hescorp's primary contention on appeal is that the contracts under which it fur-

nished the equipment and spare parts to Impregilo in Iran were "service contract[s] in support of [an] industrial project[] in Iran" entered into prior to the export ban and that therefore the shipments were exempt from the Embargo under Regulation § 535.207(a)(4). Since the government apparently agrees that at least one of the contracts to which Hescorp was a party was such a service contract, the precise issue before us is whether the service contract exception was intended to permit only the provision of services in Iran or was also thought to allow a firm like Hescorp to ship equipment and spare parts to Iran in connection with the performance of an exempted service contract.[1]

As with all questions involving the interpretation of statutes, regulations, or other authoritative prescriptions, we embark on our task by examining the actual language used by the United States in effecting the Iranian Embargo. Section 535.207(a)(1) prohibited the "sale, supply or other transfer" of "any items, commodities or products ... to or destined for Iran...." In effect, this subsection served as the foundation of the Iranian Embargo, constituting a total ban on all exports to Iran. Subsection (a)(1) provided a limited exception for "food, medicine or supplies intended strictly for medical purposes...." Hescorp's six shipments of construction equipment and spare parts to Iran clearly do not fall within this exception and Hescorp has not renewed this argument on appeal.

Significantly, subsection (a)(1) contains no exception for the "sale, supply or other transfer" of items to Iran to fulfill obligations under pre-existing service contracts. Rather, the exception in which Hes-

corp seeks to find protection is found in subsection (a)(4). As a general matter, subsection (a)(4) prohibits the "engaging ... in any service contract in support of industrial projects in Iran." The subsection then provides two exceptions to this prohibition for service contracts (1) "entered into prior to the effective date" of the embargo or (2) concerned with the provision of medical services. Hescorp's position is that the exception in (a)(4) for pre-existing service contracts should be read also to apply to the (a)(1) ban on the export of goods to Iran.[2]

Hescorp's position fails to grasp the essentially clear meaning of the Regulations. The broad, and seemingly all-inclusive, language of the (a)(1) export ban prohibits *any transfer* of *any items* for *the purposes of any enterprise in Iran.* Subsection (a)(4) provided an additional prohibition on engaging in any service contract in support of any industrial project in Iran. From this latter prohibition, the drafters of the Regulations carved a narrow exception for service contracts antedating the effective date of the Embargo.

■ In general, a proviso or exception is presumed to operate only on the section to which it is annexed, 2A *Sutherland Statutory Construction* § 47.11, at 145 (Sands 4th ed. 1984); *United States v. McClure,* 305 U.S. 472, 478, 59 S.Ct. 335, 339, 83 L.Ed. 296 (1939); *Girard Bank v. Board of Governors of Federal Reserve System,* 748 F.2d 838, 841 (3d Cir.1984), and will escape "the narrow confines of its parent provision if to so imprison it would frustrate expressed or inferable legislative aims," *Gruver v. Secretary of Health, Education*

---

1. Thus, we do not reach Hescorp's attempt to characterize these contracts as service contracts under the Uniform Commercial Code. The U.C.C. definition was developed to distinguish between contracts for the *sale* of goods, which are subject to the U.C.C., and contracts for the provision of services, which are not. Here, the embargo prohibited the "sale, supply or other transfer" of any items, not just the sale of goods. Plainly, the U.C.C. is not very pertinent to our task. More important, as discussed above, we assume for the purposes of this decision that at

least one of the Hescorp contracts was an exempted service contract.

2. As such, Hescorp's position would lead to an implicit contradiction between the export ban in (a)(1) and the pre-existing service contract exception in (a)(4). In interpreting these regulations, however, we are constrained to adhere to the maxim that courts should avoid contradictions, not create them. *See Atwell v. Merit Systems Protection Board,* 670 F.2d 272, 286 (D.C. Cir.1981).

*and Welfare,* 426 F.2d 1195, 1199 (D.C.Cir. 1969) (footnote omitted), *cert. denied,* 397 U.S. 977, 90 S.Ct. 1092, 25 L.Ed.2d 272 (1970). *See generally* 2A *Sutherland Statutory Construction* § 47.11, at 145 (Sands 4th ed. 1984).

■ Here, the aims of the government in effecting the Embargo would in no way have been frustrated by limiting the pre-existing service contract exception to the ban on the rendering of services. The purpose of this narrow exception, as far as we can ascertain, was to protect those foreigners who already were in Iran performing services. To ban such people from further *performance of services* would place them in the unenviable position of either refusing to perform the agreed upon services in Iran or disobeying American law. Contrary to the implications of Hescorp's argument that service contracts often could not be performed without replacement of machinery and parts, the purpose of the exception was not to ensure the successful completion of all ongoing industrial projects in Iran. Indeed, such a purpose would directly contradict the stated goal of the economic sanctions against Iran: To make clear that the failure to release the hostages would involve increasingly heavy costs to Iran and its interests.

Thus, under the Regulations, persons subject to United States jurisdiction could continue to render "services" under pre-existing service contracts, but the Embargo prohibited them from selling, supplying, or transferring any items, even necessary ones, to Iran. Put quite simply, if the drafters of section 535.207 had wished the pre-existing service contract exception in

(a)(4) to apply to the trade embargo in (a)(1), they would have said so.[3]

Seeking to avoid this conclusion, Hescorp asserts that the diplomatic and executive history of the Executive Order and Regulations clearly indicates that the service contract exception was designed to allow the shipment of spare parts and equipment in support of industrial projects in Iran. Hescorp observes that President Carter's statement accompanying Executive Order 12205 stated that the "official sanctions prohibiting exports from the U.S. to Iran" were "in accordance with the sanctions approved by ten members of the United Nations Security Council on January 13, in the resolution which was vetoed by the Soviet Union." Given this explicit identification of the source of the Executive Order and Regulations ultimately issued, we agree that the diplomatic history of that Resolution is pertinent to our consideration of the meaning of the subsequently enacted Regulations.

■ Indeed, historical information of this sort almost invariably is an important source of insight concerning the meaning of an enacted law. At the same time, we caution that courts must carefully consider the manner in which they use such historical data. Legislative or, as here, diplomatic history often is ambiguous and inconclusive. When a court locates historical evidence supporting its tentative interpretation of the text of a law, such evidence can be used with confidence to bolster the court's conclusion. In contrast, where historical evidence suggests a meaning contrary to the apparent import of the authoritative language, courts should be wary of relying on such evidence of intent to override the plain meaning of the text actually

---

**3.** We note that subsection (a)(4) also exempts from its prohibition service contracts "concerned with the provision of medical services." Significantly, subsection (a)(1) contains an exception for the transfer of "medicine or supplies intended strictly for medical purposes...." If, however, we accepted Hescorp's view of the interrelationship between (a)(1) and (a)(4), there would seem to be no need to exempt medicine under (a)(1), as it could be transfered to Iran in connection with a contract concerned with the provision of medical services. Rather,

a more reasonable interpretation of the regulation would view subsection (a)(1) as dealing with any transfer of items, and subsection (a)(4) as involved solely with the provision of services.

As the district court stated, "under the regulation the transfer of commodities pursuant to a service contract is prohibited under both subdivision (a)(1) and (a)(2) and the fact that the contract involved is one entered into after [sic] April 7, 1980, serves only to remove one of two alternative bases for prohibiting the transfer...."

used. *Cf. Ford Motor Credit Co. v. Cenance,* 452 U.S. 155, 158 n. 3, 101 S.Ct. 2239, 2241 n. 3, 68 L.Ed.2d 744 (1981) (per curiam) ("Absent a clear indication of legislative intent to the contrary, the statutory language controls its construction.").

As discussed above, the plain meaning and the structure of the Regulations indicate that the Iranian Embargo effected a complete ban on the type of shipments Hescorp made to Iran. The anecdotal, isolated statement of Ambassador Gardner simply is insufficient to overcome the largely plain meaning of the Regulations. First, Ambassador Gardner was merely one of the many actors who participated in resolving the hostage crisis and his understanding of the legal import of the Embargo is hardly dispositive. Moreover, as has already been demonstrated, Ambassador Gardner's understanding of the scope of the service contract exception contradicts the ordinary meaning of the text used. Finally, a more important participant in the development of the subject Regulations, OFAC, issued several contemporaneous interpretations of the Regulations that support the conclusion that Hescorp's shipments of spare parts to Iran did not fall within the service contract exception.

■ Since OFAC was the agency charged with administering the Regulations, its views are entitled to substantial deference. *Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982). This is especially so here, because OFAC participated in developing the subject Regulations. *Miller v. Youakim,* 440 U.S. 125, 144, 99 S.Ct. 957, 968, 59 L.Ed.2d 194 (1979).

It appears that OFAC denied licenses to several companies seeking permission to ship parts and materials to Iran for the use of other companies holding service contracts relating to industrial projects. For instance, on May 28, 1980, Zoker International, Ltd., a manufacturer of tunneling and mining equipment based in Aurora, Illinois, applied to OFAC for a license to sell tunneling equipment to a French contractor for the purpose of building a sub-

way system in Tehran. Although Zoker presented several compelling equitable arguments in favor of granting the license, OFAC denied Zoker's request, stating: "Transactions of this type are not consistent with the present policy of this Government with respect to Iran." OFAC received a similar license application from Barber-Webb Company, Inc., a manufacturer of plastic pipe linings based in Los Angeles, California. Again, OFAC denied the license application because "[t]ransactions of this sort [were] not consistent with" the policy of the United States.

Particularly revealing of the manner in which the service contract exception was designed to work was OFAC's interpretation of the Regulations with regard to the International Telephone & Telegraph Corporation ("ITT") case. ITT had installed certain navigational equipment in Iran under a 1978 contract. All of the equipment had been delivered in 1978. The contract required ITT to provide certain technical training. At a meeting in July of 1980, OFAC informed ITT that its training would be permitted under section 535.207(a)(4), but that ITT was not to provide any documentation, including training manuals, in connection with such training.

The only OFAC action in which Hescorp finds any support is an agenda item in one of the meetings of OFAC's Ad-Hoc Group on Iranian Sanctions. Although the factual situation presented to the Ad-Hoc Group involved the shipment to Iran of new material, OFAC determined not to object to such transfers because of their "nexus with an exempted service contract." Although this statement apparently supports Hescorp's position, we do not believe it should be given conclusive weight. First, the agenda item explicitly stated that this case presented "the issue of the relationship between the policies behind § 535.207 which exempts pre-existing service contracts and § 535.206 which prohibits financial transfers." More important, the service contract referred to in the agenda item was between a foreign subsidiary of a United States company and Iran. Since foreign

companies were not covered by section 535.207, the transfers referred to were not barred by the Regulations, and thus OFAC merely decided "not to attempt to persuade the company to withdraw from the project...."

In sum, the Regulations prohibited Hescorp's transfer of spare parts to Iran. The ban in (a)(1) was total and the limited exception to (a)(4)'s prohibition on engaging in service contracts should not be read also as an exception to the (a)(1) ban on exports.

■ We reject Hescorp's attempt to invoke the rule of lenity. That maxim is a doctrine of last resort, to be used only after the traditional means of interpreting authoritative texts have failed to dispel any ambiguities. *E.g., United States v. Turkette,* 452 U.S. 576, 587 n. 10, 101 S.Ct. 2524, 2531 n. 10, 69 L.Ed.2d 246 (1981); *United States v. Culbert,* 435 U.S. 371, 379, 98 S.Ct. 1112, 1116, 55 L.Ed.2d 349 (1978); *United States v. Goldberg,* 756 F.2d 949, 956 (2d Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 2706, 86 L.Ed.2d 721 (1985). Here, as stated above, the Regulations were sufficiently clear to notify Hescorp that its shipments to Iran were prohibited.

### B. *Void-for-Vagueness*

Hescorp submits, alternatively, that if the Regulations prohibited its shipments of equipment and spare parts to Iran, they failed to provide adequate and fair notice thereof and therefore were unconstitutionally vague. We cannot agree.

The Supreme Court has stated that "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). That the government "might, without difficulty, have chosen '[c]learer and more precise language' equally capable of achieving the end which it sought does not mean that the [regulations] which it in fact drafted [are] uncon-

stitutionally vague." *United States v. Powell,* 423 U.S. 87, 94, 96 S.Ct. 316, 321, 46 L.Ed.2d 228 (1975) (quoting *United States v. Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538, 1541, 91 L.Ed. 1877 (1947)); *United States v. Herrera,* 584 F.2d 1137, 1149 (2d Cir.1978). Rather, regulations are unconstitutionally vague "only when [they] expose[ ] a potential actor to some risk or detriment without giving him fair warning of the nature of the proscribed conduct." *Rowan v. United States Post Office Department,* 397 U.S. 728, 740, 90 S.Ct. 1484, 1492, 25 L.Ed.2d 736 (1970).

■ In this case, the Executive Order and the Regulations gave Hescorp fair notice that its intended shipments to Iran were prohibited. Indeed, the ambiguity that Hescorp points to in the Regulations arises mainly from Hescorp's tortured attempt to read the (a)(4) exemption into subsection (a)(1) and its unjustified assumption that the phrase "service contract" should be given a specialized connotation from the world of commercial law, *viz.,* a contract calling *predominately* for the provision of services. We do not believe these Regulations were so vague as to unfairly put Hescorp at risk.

Moreover, the crime with which Hescorp was charged is one of specific intent. If Hescorp had entered a plea of not guilty, the government would have been required to prove that Hescorp specifically intended to violate the Iranian Embargo Regulations. As we recently recognized, a requirement of willfulness makes a vagueness challenge especially difficult to sustain. *United States v. MacKenzie,* 777 F.2d 811, 816 (2d Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986). "As the Supreme Court said in *United States v. Ragen,* 314 U.S. 513, 524, 62 S.Ct. 374, 379, 86 L.Ed. 383 (1942): 'On no construction can the statutory provisions here involved become a trap for those who act in good faith. A mind intent upon willful evasion is inconsistent with surprised innocence.'" *MacKenzie,* 777 F.2d at 816.

### C. *Doctrine of Necessity*

 Nor can Hescorp claim justification for its acts under the doctrine of necessity. Hescorp invoked this defense, alleging that the shipments to Iran to complete the Lar Dam were necessary to protect the lives of the foreign workers and their families in Iran and to avert severe flooding and other disasters. To justify its criminal acts under this doctrine, however, Hescorp was required to demonstrate that the "necessity" was compelling, leaving no other course of conduct. So long as there existed a "reasonable, legal alternative to violating the law," *United States v. Bailey*, 444 U.S. 394, 410, 100 S.Ct. 624, 635, 62 L.Ed.2d 575 (1980), Hescorp cannot justify its criminal acts by the doctrine of necessity. Consequently, this defense is highly fact sensitive and can be determined properly only after trial. Here, apart from Hescorp's unsubstantiated claims, there is no indication that the parts and supplies Hescorp shipped to Iran were necessary to avert a major catastrophe or that these items were not available from some source not subject to the jurisdiction of the United States. More important, Hescorp neither availed itself of the option of applying to OFAC for a license to export the "necessary" items nor demonstrated that such an application would have been futile. Thus, the necessity defense was unavailable to Hescorp as a matter of law.

### III. CONCLUSION

Accordingly, finding that Hescorp's conduct was prohibited by Executive Order No. 12205 and the Treasury Regulations, that the Order and Regulations were not unconstitutionally vague, and that Hescorp cannot avail itself of the necessity defense, we affirm the judgment of conviction.