**2255 NEW YORK AVENUE, LTD., Plaintiff,**

v.

**Honorable Henry CISNEROS, et al., Defendants.**

**No. 4:92–CV–560–A.**

United States District Court, N.D. Texas, Fort Worth Division.

Jan. 14, 1994.

Robert Loyd Tobey, Johnston & Budner, Dallas, TX, Steven D. Gordon, Michael H. Ditton, Richard O. Duvall, Dunnells & Duvall, Washington, DC, Martin L. Lowy, Law Office of Martin L. Lowy, Dallas, TX, for plaintiff.

Steven M. Goldstein, U.S. Dept. of Housing & Urban Dev., Washington, DC, Howard Alan Borg, U.S. Attorney's Office, Ft. Worth, TX, Felix V. Baxter, U.S. Dept. of Justice, Civil Div., Washington, DC, Judry L. Subar, U.S. Dept. of Justice, Civil Div., Washington, DC, for Jack Kemp.

Dan Allan White, John Joseph Harvey, Jr., Hill Heard Gilstrap Goetz & Moorhead, Arlington, TX, for Arlington Housing Authority.

## MEMORANDUM OPINION and ORDER

McBRYDE, District Judge.

Before the court for decision are motions for summary judgment. The court has concluded that the motion of plaintiff, 2255 New York Avenue, Ltd., should be granted and that the motions of defendant Henry Cisneros, Secretary, United States Department of Housing and Urban Development, (hereinafter "HUD") should be denied.

## I.

### Nature of the Litigation

This action is one of several pending throughout the United States [1] involving the so-called Section 8 Moderate Rehabilitation Program ("Mod Program"), a rent subsidy program operated by HUD under the authority of section 8 of the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437f. HUD funds this program through annual contributions contracts with public housing agencies such as defendant Arlington Housing Authority ("AHA").[2] Those agencies, in turn, enter into contracts to make housing assistance payments to private owners of housing in which some or all of the units are to be leased to lower income families. A section 8 housing assistance payments contract specifies a "contract rent" for each covered unit. The amount of the monthly housing assistance payment for each unit is the difference between the contract rent and the amount the tenant is required to pay as rent.

Plaintiff is the owner and operator of the Pebble Creek Apartments complex ("Pebble Creek") in Arlington, Texas. In 1988, plaintiff purchased and renovated Pebble Creek pursuant to the Mod Program. As an integral element of those activities, plaintiff entered into a 15–year Housing Assistance Payment Contract ("HAP Contract") with AHA

---

1. Information provided by the parties indicates that actions comparable to this action are *Windsong Hous. Assoc., Ltd. v. Cisneros*, No. 92–C–647–E (N.D.Okla. Nov. 26, 1993); *Foxglenn Investors Ltd. Partnership v. Hous. Auth. for Prince George's County*, No. WN–93–73 (D.Md. Aug. 9, 1993); *Terrace Hous. Assoc., Ltd. v. Cisneros*, No. 92–786–T (W.D.Okla. May 11, 1993), *appeal docketed*, Nos. 93–6267 and 93–6276 (10th Cir. Aug. 5, 1993, and Aug. 9, 1993); *Rolling Green Hous. Assoc., Ltd. v. Cisneros*, No. 92–1372T (W.D.Okla. May 11, 1993), *appeal docketed*, Nos. 93–6268 and 93–6272 (10th Cir. August 5, 1993 and Aug. 7, 1993); *Linden Hous. Assoc., Ltd. v. Cisneros*, No. CV–N–92–358–HDM (D.Nev. Feb. 23, 1993), *appeal docketed*, Nos. 93–15899, 93–15903 (9th Cir. May 18, 1993).

2. Sometimes the contract rents are paid by HUD directly to the owner of the apartments, but, other times, such as in this case, they are paid to a local housing authority such as AHA, which, in turn, receives funding from HUD for the payments. Transcript of 8/18/93 hearing at 7.

to rent 334 of the 352 apartments in Pebble Creek to low income tenants. The HAP Contract specified the contract rents for the various apartment units. Pebble Creek is the sole asset of plaintiff. Plaintiff financed the purchase and rehabilitation of Pebble Creek with a HUD coinsured mortgage loan obtained from a HUD-approved coinsuring lender. The loan was secured, in part, by a pledge of plaintiff's prospective income from the HAP Contract.

In 1992 HUD decided the contract rents were too high. At HUD's direction, AHA informed plaintiff that it would reduce the contract rents and would recoup from plaintiff the allegedly excessive part of rent payments previously made. The parties sometimes refer to the attempted rent reduction, which defendants seek to make retroactive, as a "rent rollback."

Plaintiff then filed this action seeking declaratory, mandamus and injunctive relief to halt the threatened rent rollback. Specifically, plaintiff asserts that:

1. The rent rollback violates Section 142(d) of the Housing and Community Development Act of 1987, Pub.L. No. 100–242, 101 Stat. 1815 (enacted Feb. 5, 1988 and codified at 42 U.S.C. § 1437f(c)(2)(C)) [hereafter "§ 142(d)"], and therefore gives rise to a cause of action for mandamus against defendant [HUD].

2. The rent rollback violates the Administrative Procedure Act ("APA") as to defendant [HUD], and constitutes an anticipatory breach of contract as to defendant AHA, because

(i) the rollback violates § 142(d);

(ii) there is no regulatory or contractual authority for the rollback;

(iii) any regulatory or contractual authority for the rollback has expired due to the passage of time between the execution of the HAP Contract and the attempt to institute the rollback;

(iv) a "post audit" of the initial contract rents has already been conducted and there is no authority to do yet another audit and adjustment of those rents;

(v) defendants are bound by the initial contract rents, under theories of estoppel and agency; and

(vi) the initial contract rents were correct.

3. Defendant AHA is barred by the doctrine of laches from effectuating the rent rollback.

Pretrial Order at 2–3.

HUD denies plaintiff's assertions as described in 1, 2, and 3 above, contending that it had the authority to reduce the rents pursuant to the provisions of the HAP Contract and under the authority of applicable HUD regulations.[3] AHA's primary response is that it has not engaged in conduct that would constitute an anticipatory repudiation of the contract because it has not unconditionally taken the position that it will not pay in the future the rents called for by the HAP Contract. It goes on to contend that its conduct in advising plaintiff that the rents would be reduced is proper because it acted on instructions of HUD. And, AHA joins with HUD in a denial generally of the merit of any of plaintiff's theories of relief.

By agreement of the parties, the rent rollback has been held in abeyance pending the outcome of this action.

## II.

### Summary Judgment History

Plaintiff has filed a motion for summary judgment as to certain of its theories of relief. HUD responded by filing an instrument referred to as a second amended mo-

---

**3.** In its "Second Amended Motion for Summary Judgment" HUD, somewhat in passing, asserts that there is a "jurisdictional infirmity of the pendency of this case here rather than in the United States Claims Court." Memorandum of Law in Opposition to Plaintiff's Motion for Sum-

mary Judgment and in Support of Defendant Kemp's Motion for Summary Judgment (attached to Defendant Kemp's Second Amended Motion for Summary Judgment) [hereinafter "Kemp's Memorandum"] at 3 n. 1. HUD aban-

tion for summary judgment[4] in which, in addition to making known its opposition to plaintiff's motion, HUD sought summary judgment as to all theories of relief asserted by plaintiff that were not urged by plaintiff as grounds of plaintiff's motion.

A hearing was held on the motions on August 18, 1993, at which time the parties, through their respective counsel, clarified on the record their positions relative to the motions. At the August 18 hearing the court invited the parties to submit briefs on the issue of whether the facts of this action would support the conclusion that HUD is estopped to cause a reduction to be made in the rental subsidies; and, in late August 1993 each party filed such brief. The court is treating the estoppel theory as having been asserted by plaintiff as a ground of its motion for summary judgment because all parties have understood since August 18, 1993, that the court has considered the estoppel doctrine potentially dispositive at the summary judgment stage.

On September 30, 1993, HUD filed another motion for summary judgment, that one asking for a summary ruling that the rent rollback was not arbitrary and capricious.

In anticipation of a pretrial conference, the parties submitted an agreed pretrial order, which was accepted by the court as reflecting agreements of the parties and filed on December 20, 1993. It contains, in addition to concise statements of the contentions of the parties, a rather detailed listing of facts that are established without dispute by pleadings, stipulations, or admissions. During a telephone conference the court and the parties held December 21, 1993, the parties agreed that (i) the court can deem that plaintiff has asserted as grounds of its motion for summary judgment each of the theories of relief asserted by plaintiff in paragraphs 1, 2, and 3

of the December 20 pretrial order,[5] (ii) the court can deem that each defendant has moved for summary judgment on the ground that none of the theories of relief asserted by plaintiff in those paragraphs has legal merit,[6] and (iii) the only issues to be resolved are legal issues that can be dealt with summarily by the court through the summary judgment process.[7]

### III.

#### Undisputed Facts

There is no dispute between the parties as to the facts that are set forth in the first three paragraphs of section I above. In the agreed pretrial order filed December 20, the parties agreed as to the following facts:[8]

1. Plaintiff is a Texas limited partnership and is the owner of Pebble Creek Apartments. The general partner of plaintiff is GCJM, Inc., a Texas corporation.

2. Defendant Cisneros is the Secretary of HUD.

3. AHA is located in Arlington, Texas. It is a public body corporate created pursuant to the terms of the Texas Housing Authorities Law, 3 Tex. Local Gov't Code Ann. § 329.001 *et seq.* (West 1988). Further, it is a public housing agency as defined in Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f, as amended, ("Section 8").

4. Pebble Creek is located in Arlington, Texas, and consists of 352 apartments located in 39 two-story buildings. Three hundred thirty-four apartment units receive rent supplements under Section 8: 192 one-bedroom, 124 two-bedroom, and 18 three-bedroom units.

5. In July 1987, GCJM, Inc., ("GCJM") submitted a proposal to defendant AHA to

doned that contention by failing to include it in the pretrial order.

4. The "second amended" motion of HUD actually is the first motion for summary judgment filed by HUD, its earlier attempts to file a motion for summary judgment having been unsuccessful because of procedural shortcomings in the attempted filings.

5. The text of paragraphs 1, 2, and 3 of the pretrial order is set forth at pages 926–27 of this memorandum opinion and order.

6. *See* Transcript of 12/21/93 telephone conference at 4–7.

7. *Id.* at 2–3.

8. The stipulated facts are set forth at pages 5–10 of the Pretrial Order.

rehabilitate Pebble Creek pursuant to the Mod Program. GCJM proposed to finance the purchase and rehabilitation of Pebble Creek with a HUD "coinsured" loan under Section 221(d)(4) of the National Housing Act from Benton Mortgage Company ("Benton"), a HUD-approved coinsuring lender. The renovation would be performed pursuant to an Agreement to Enter into Housing Assistance Payments Contract ("AHAP") between the owner and AHA. Upon completion of the renovation, the project would become the subject of a 15–year HAP Contract between the owner and AHA, funded by HUD under the Mod Program, to rent the apartments to low income tenants at subsidized rental rates established by the contract.

6. By letter dated August 10, 1987, AHA accepted GCJM's proposal to rehabilitate Pebble Creek pursuant to the Mod Program.

7. On November 19, 1987, Benton determined the following unit contract rents for Pebble Creek: 1BR $427; 2BR $500; 3BR $627. Benton submitted these contract rents to AHA for approval and, by letter dated November 30, 1987, AHA requested HUD field office approval of these rents.

8. In December 1987, plaintiff was formed and executed an AHAP with defendant AHA with respect to Pebble Creek.

9. On January 6, 1988, plaintiff executed a mortgage note with Benton for $8,129,700. Plaintiff also executed a conditional assignment which pledged to Benton, as security for the mortgage note, all of its rights to receive Pebble Creek contract rents.

10. By letter dated January 14, 1988, AHA submitted revised contract rents for Pebble Creek, prepared by Benton, to HUD for review and approval. These revised rents were as follows: 1BR $407; 2BR $496; 3BR $597.

11. Prior to receiving HUD's approval for these rents, AHA submitted a third set of Pebble Creek contract rents, also prepared by Benton, to HUD for approval by a letter of January 21, 1988. This third set of rents was as follows: 1BR $407; 2BR $475; and, 3BR $595. HUD approved those rents in a January 26, 1988, letter to AHA, which stated as follows:

In our letter dated January 22, 1988, we concurred in your Base Rent and Contract Rent calculations for the subject project. In doing so, we referred to the documentation which you submitted with your letter dated January 14, 1988. Our reference should be to the documentation submitted with your letter dated January 21, 1988.

12. On January 26, 1988, plaintiff went to closing on its contract to purchase Pebble Creek and completed the purchase of the property.

13. Thereafter, plaintiff performed the rehabilitation of Pebble Creek in fulfillment of its obligations under the AHAP.

14. The rehabilitation of Pebble Creek was completed in seven stages. Between May 1 and November 1, 1988, AHA and plaintiff executed the HAP Contract for each stage upon its completion. The contract rents of 1BR $407; 2BR $475; and 3BR $595 were used in the HAP Contract with respect to each and every stage of the Pebble Creek project.

15. Following the completion of the rehabilitation at Pebble Creek, both plaintiff and its general contractor submitted certifications of their actual costs, supported by accountants' opinions, to Benton in December 1988 and January 1989. Pursuant to HUD regulations and procedures, Benton was responsible for reviewing these certifications and making any necessary adjustments to the mortgage amount and to the Section 8 contract rents.

16. Benton reviewed these cost certifications and disallowed some $31,000 worth of items, which required a corresponding reduction in the principal amount of the mortgage note. However, Benton made no change in the amounts of the Section 8 contract rents.

17. On December 11, 1990, Benton reviewed updated cost certifications for Pebble Creek provided by plaintiff and made a further reduction of $12,500 in the maximum insurable mortgage amount. On December 24, Benton and plaintiff executed a modification to the mortgage note which reduced the principal amount to $8,085,400. Once again, Benton made no change in the amounts of the Section 8 contract rents.

18. Upon the completion of this cost certification process, HUD endorsed the modified Pebble Creek mortgage for coinsurance purposes on or about December 24, 1990, thus rendering plaintiff's cost certification incontestable pursuant to 12 U.S.C. § 1715r.

19. In 1990, HUD approved a special adjustment of the Pebble Creek contract rents based on increased operating expenses. In 1992, HUD approved an annual adjustment of the contract rents. These adjustments raised the contract rents to the following levels, which were in effect in 1992 through July: 1BR $457; 2BR $526; and, 3BR $641.

20. Meanwhile, as part of a nationwide review of the contract rents for all Mod Programs, a HUD review team re-examined the initial contract rents for Pebble Creek during October and November 1991. HUD concluded that the initial contract rents had been set too high because they had been incorrectly calculated.

21. At HUD's direction, AHA sent a letter dated June 23, 1992, to the property manager for Pebble Creek informing it that as of August 1, 1992, the contract rents would be reduced pursuant to the conclusions of the HUD review team.

22. Subsequently, in a July 7, 1992, letter to the Pebble Creek managing agent, AHA announced that, as of August 1, 1992, the contract rents would be:

| 1 BR | $454 | (versus $457) |
| 2 BR | $521 | (versus $526) |
| 3 BR | $636 | (versus $641) |

Furthermore, again at HUD's direction, AHA announced that it was calculating the alleged contract rent "overpayments" previously made to Pebble Creek, as a prelude to recouping them.

\* \* \* \* \* \*

At the August 18 hearing on motions for summary judgment HUD's position was clarified by factual concessions made by its attorney. Benton acted on behalf of HUD in initially setting the contract rents and again in determining subsequent revisions in the rent amounts as a result of an audit[9] performed by Benton for HUD after the rehabilitation work was completed. Transcript of 8/18/93 hearing at 29, 31–33, 39–40, 56–57, 59–60. Moreover, HUD, through its counsel, conceded that HUD has no evidence that there was any impropriety on the part of plaintiff that caused the contract rents to be more than they should have been. *Id.* at 41–42. Finally, HUD, through its counsel, acknowledged that the rent rollback it is seeking to accomplish is based on judgment calls of its new auditing team that initially were made, with different results, on behalf of HUD by Benton:

> THE COURT: Okay. Now, the judgments initially were exercised by HUD through Benton?
>
> MR. SUBAR: Not in a binding fashion.
>
> . . . .
>
> THE COURT: But they were initially exercised on behalf of HUD by Benton?
>
> MR. SUBAR: Yes. Initially by the owners and then by Benton, correct.
>
> THE COURT: And you are saying, even though HUD through Benton has exercised those judgments and ha[d] approved these rents at the outset, that HUD can still come back and change them?
>
> MR. SUBAR: That's correct. . . .

*Id.* at 49–50. At another point, the attorney said that HUD's position is that it has the right, throughout the life of the fifteen-year HAP Contract, to make rent rollbacks based on errors in computation in the original contract rents "as long as plaintiffs are [sic] not prejudiced." *Id.* at 17.

The parties seem to be in agreement that the amount of contract rent was a factor in determining the amount of the mortgage payments plaintiff could afford to make on the indebtedness it incurred in the acquisition and rehabilitation of the project and that the financial viability of plaintiff and Pebble Creek could be imperiled if the rent rollback were to be allowed.

---

**9.** HUD prefers to call the audit performed by Benton a "review of cost certifications," transcript of 8/18/93 hearing at 31–32, but the record makes clear that the work Benton actually did was in the nature of an audit made after the rehabilitation work had been accomplished. *Id.* at 31–32, 39–40, 56–57, 59–60.

## IV.

### Section 142(d) of the Housing and Community Development Act of 1987

HUD's position is that the rent rollback is being made pursuant to authorization contained in the HAP Contract and regulations that govern the Mod Program. *Id.* at 10. The Hap Contract provides in pertinent part:

1.5 Housing Assistance Payments.

> A. Amount of Contract Rent. The initial Contract and Base Rent for each Contract Unit are stated in Exhibit A. These rents are subject to post-audit and change in accordance with HUD requirements, including the correction of error in computation.

Complaint, Ex. "7" at 1. The regulations to which HUD refers are 24 C.F.R. 882.-408(d)(1)(v) and 882.507(c). Transcript of 8/18/93 hearing at 11. Plaintiff responds, *inter alia,* that the language added to 42 U.S.C. § 1437f by § 142(d) of the Housing and Community Development Act of 1987 provides an absolute prohibition against any decrease in the contract rents unless the project has been refinanced in a manner that reduces the finance payments of plaintiff.[10] The language added by § 142(d) reads:

> The Secretary may not reduce the contract rents in effect on or after April 15, 1987, for newly constructed, substantially rehabilitated, or moderately rehabilitated projects assisted under this section (including projects assisted under this section as in effect prior to November 30, 1983), unless the project has been refinanced in a man-

ner that reduces the periodic payments of the owner.

Pub.L. 100–242, 101 Stat. 1815, 1850, § 142(d).

The court's attention has been called to five district court opinions in each of which the question now under discussion was treated. *See supra* at 925 n. 1. In each, the deciding court expressed basic agreement with the proposition urged by plaintiff that the language added by § 142(d) prohibits a rent adjustment of the kind HUD is seeking to make in this case. As persuasive as those opinions are, the court has concluded that the § 142(d) language does not apply to the rent rollback HUD is attempting to effectuate.

Congress made the § 142(d) language an integral part of subparagraph (C) of subsection (2) of § 1437f(c). Subparagraph (C) pertains to adjustments of kinds contemplated by the two preceding subparagraphs of that same subsection. The beginning sentence of subparagraph (C) reads:

> Adjustments in the maximum rents under subparagraphs (A) and (B) shall not result in material differences between the rents charged for assisted units and unassisted units of similar quality, type, and age in the same market area, as determined by the Secretary.[11]

42 U.S.C. § 1437f(c)(2)(C). Subparagraphs (A) and (B), in turn, provide for specific kinds of adjustments in rents—subparagraph (A) pertains to adjustments to rents that are to be made annually, or more frequently, to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or on the basis of a reasonable formula, and subpara-

---

**10.** There is no contention that there has been a refinancing of the project.

**11.** Prior to the amendment of § 1437f(c)(2)(C) by the Stewart B. McKinney Homeless Assistance Amendments Act of 1988 ("McKinney Act"), the beginning sentence of the subparagraph read:
Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted units and unassisted units of similar quality, type, and age in the same market area, as determined by the Secretary.
*See* Pub.L. 100–628, 102 Stat. 3224, 3264, § 1004(a)(1). Other changes have been made in § 1437f(c)(2) since the adoption of § 142(d). *See*

42 U.S.C.A. § 1437f (supp. pam. 1993), Historical and Statutory Notes, at 75–76. HUD's arguments are based on the language of § 1437f(c)(2) as it existed post–§ 142(d), but pre-McKinney Act. Defendant Kemp's Memorandum at 7. On the other hand, plaintiff and AHA both present their arguments in the context of the post-McKinney Act version of § 1437f(c)(2). Arlington Housing Authority's Response to Plaintiff's Motion for Summary Judgment at 9; Plaintiff's Response to Defendant Kemp's Amended Motion for Summary Judgment at 5–6. The differences between the pre-McKinney and post-McKinney Act wording of the statute do not affect the outcome of the issue under discussion.

graph (B) pertains to adjustments to rents that are to be made for one of the reasons that are stated with particularity in the subparagraph. The text of the second and subsequent sentences of § 1437f(c)(2)(C) is quite clearly related to the first sentence and the kinds of adjustments it contemplates.

In determining the meaning of statutory language, the court must take into account the context in which it is found. *See King v. St. Vincent's Hosp.*, — U.S. —, —, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 220–21, 106 S.Ct. 2485, 2493, 91 L.Ed.2d 174 (1986). A proviso in a statute or regulation is presumed to operate only on the section in which it is found or placed. *See United States v. Hescorp, Heavy Equipment Sales Corp.*, 801 F.2d 70, 74 (2nd Cir.) (citing 2A *Sutherland Statutory Construction*, § 47.11, at 145 (Sands 4th ed. 1984)), *cert. denied,* 479 U.S. 1018, 107 S.Ct. 672, 93 L.Ed.2d 723 (1986). The court has concluded that the most reasonable reading of § 1437f(c)(2) in its entirety is that the statutory language upon which plaintiff relies applies only to adjustments in contract rents of those kinds contemplated by 42 U.S.C. § 1437f(c)(2)(A) and (B).[12] Inasmuch as the attempted rent rollback in question is not an adjustment of any of those kinds, it is not prohibited by the language added by § 142(d).

### V.

*HUD's Contention that the Rent Rollback is Authorized by the HAP Contract and Regulations that Govern the Mod Program*

As previously noted, HUD pitches its case on the theory that the rent reductions made by its review team disclosed errors in computation of the initial contract rents and that, as a consequence, HUD had the right to reduce the contract rents and effect the rent rollback pursuant to the authority of the HAP Contract and related regulations. The court agrees with plaintiff that HUD has no contractual or regulatory authority for the rent rollback.

First, the court considers inappropriate HUD's characterization of the changes in rents made by its review team as corrections of "errors in computation." As HUD acknowledged at the August 18 hearing, the factors by which HUD seeks to justify the rollback are but a remaking by HUD, through another designee, of the same judgment decisions that were made with a different result by its first designee, Benton. HUD has failed to come forward with any authority that it has an ongoing right to make downward adjustments in the contract rents based on second-guessing of the judgment it, through its designee, initially exercised in arriving at the rents. The contract provides no authority for conduct of that kind. While the rents specified in the contract are, by virtue of § 1.5.A of the contract, subject to post-audit and change, HUD, through Benton, performed the post-audit after the rehabilitation work was completed and made the post-audit changes at that time, thus exhausting the contractually authorized post-audit change authority. In any event, four years after the fact would be too late as a matter of law for a "post-audit" under authority of § 1.5.A. In addition to relying on § 1.5.A of the HAP Contract, AHA asserts reliance on §§ 1.5.A and 1.6.D of the earlier made AHAP. For the same reasons why the HAP Contract and related regulations do not provide support for HUD's position, the AHAP does not provide support for the positions of either defendant. The provisions of the AHAP do not add anything pertinent to the subject under discussion to the part of the HAP Contract and the regulations upon which HUD relies.

Second, HUD's reliance on the regulations at 24 C.F.R. § 882.408(d) is misplaced because those regulations permit adjustment of rents only during the rehabilitation period.

---

12. In order to reach this result, the court does not need to resort to the legislative history discussed by the parties. *City of Madison v. Bear Creek Water Ass'n, Inc.*, 816 F.2d 1057, 1059 (5th Cir.1987). If the legislative history were to be considered, the court's conclusion would not change.

The court agrees with the reasoning of the *Foxglenn Investors* court on this subject:

> HUD next argues that the HAP contract and corresponding regulations allow it to reduce FGI's initial contract rents. The Court finds that these provisions do not give HUD the authority to roll back rents under the circumstances of this case. HUD first relies on regulations found at 24 C.F.R. § 882.408(d).[ ] This provision, however, permits adjustment of rents only during the rehabilitation period. As the regulation governing the execution of the HAP contract, 24 C.F.R. § 882.508, explains, at the time the HAP contract is executed, "[t]he Contract Rents may be higher or lower than those specified in the [AHAP] in accordance with the requirements of § 882.408(d)." Considering these two regulations together, the Court finds that § 882.408(d) permits adjustments of the initial contracts rents, as calculated in the AHAP and incorporated into the HAP contract, only during the rehabilitation period, but that once the renovations are completed and the HAP contract is executed, § 882.408(d) no longer applies. Consequently, 24 C.F.R. § 882.408(d) cannot be the basis for the rent reductions at issue in this case.

Slip op. at 14–15. For the reasons thus expressed, § 882.408(d) cannot be the basis for HUD's attempted rent rollback in this action.

Third, although the regulations at 24 C.F.R. 882.507(c) authorize a post-audit and adjustment to the contract rents based on the results of that audit, that post-audit authority is so limited that it is not applicable to the instant case. The reasoning of the *Linden Housing Associates, Ltd.* court on this subject applies equally to this case:

> [T]he scope of HUD's "postaudit" authority is limited to verifying the owner's cost and mortgage loan certifications, and recalculating the contract rents if any material errors are discovered in those certifications. However, this "postaudit" authority is not a grant of plenary power to audit and redo calculations of contract rents based upon alleged errors unrelated to the verification of the owner's cost and mortgage loan certifications.

Slip op. at 4; *accord Rolling Green*, slip op. at 5, and *Foxglenn, Investors,* slip op. at 15–16. In this case, the parties have agreed that plaintiff's cost certification became incontestable in December 1990. Even if incontestability of the certification were not relevant to the issue under discussion, the fact would remain that the regulations cannot reasonably be read as authorizing a contract rent reduction based on a post-audit made four years after the contract rents were established and the parties had arranged their affairs in reliance on those rents and after the activities of the parties had been governed for four years by the assumption that the rents had finally been agreed on. HUD's post-audit authority under § 822.507(c) simply does not apply to the rent rollback HUD is attempting to accomplish in this case.

For the reasons stated above, the attempted rent rollback was arbitrary, capricious, an abuse of discretion by HUD, and not in accordance with law; and, HUD's attempt to accomplish the rollback was in excess of any authority it possessed by statute, regulation, or other law. *See* 5 U.S.C. § 706. Thus, the court concludes that the attempted rent rollback is unlawful and should be set aside. In making these rulings, the court has reviewed all items cited to the court as parts of the record that led to the decision by HUD to make the rent rollbacks and has taken into due account the rule of prejudicial error.

## VI.

*Relief that Should Flow from the Conclusions Reached by the Court Relative to Unenforceability of the Attempted Rent Rollback*

The court has determined that it should order that (1) the attempted rent rollback is ineffective and unenforceable, and of no force or effect, (2) HUD and AHA cease and desist, and are permanently enjoined, from any further attempt to reduce the contract rents or housing assistance payments for Pebble Creek based on the attempted rent rollback in question, or on the basis of any of the facts or circumstances that played a part in

HUD's decision to effect the attempted rent rollback, and (3) HUD and AHA take no steps in the future to reduce, or to minimize any increase in, contract rents or housing assistance payments for Pebble Creek that otherwise would be available for the owner of Pebble Creek based on any of such facts or circumstances:

In connection with the foregoing, the court has concluded, based on the undisputed facts, that AHA committed an anticipatory breach of the HAP contract by informing the owner of Pebble Creek of AHA's intention to recalculate the base and contract rents for Pebble Creek and to make rent reductions, subject to HUD approval, to take effect August 1, 1992, and by advising the owner of Pebble Creek that it has been instructed to reduce the contract rents for the Pebble Creek project to $454 for one bedroom units, $521 for two bedroom units, and $636 for three bedroom units.

## VII.

### *Miscellaneous Matters to be Resolved*

From the determinations expressed above, the conclusion follows that all summary judgment relief sought by HUD is to be denied. While the court considers that estoppel is before the court at this summary judgment stage, the court has concluded that it need not resolve that theory in order for a final determination to be made. The court does note that this might well be one of those exceptional cases where a ruling of estoppel against United States of America would be appropriate if there did not exist a legal basis for the requested relief. The court has not reached for decision the contention of plaintiff that the initial contract rents were correct or plaintiff's contention that AHA is barred by the doctrine of *laches* from effectuating the rent rollback.

Plaintiff has included in its prayer a request for "disbursements and attorney's fees", Complaint at 20, but has not provided to the court any authority or factual material in support of that claim, nor is such a claim mentioned in the pretrial order. The court made known to the parties during the December 21, 1993, telephone conference between the court and the attorneys that the pretrial order would define the contentions of the parties. Transcript of 12/21/93 telephone conference at 6. Therefore, the court is treating plaintiff's request for recovery of "disbursements and attorney's fees" as having been abandoned.

## VIII.

### *Order*

The court, therefore, ORDERS and DECLARES that:

(1) the attempted rent rollback is ineffective and unenforceable, and of no force or effect;

(2) HUD and AHA cease and desist, and are permanently enjoined, from any further attempt to reduce the contract rents or housing assistance payments for Pebble Creek based on the attempted rent rollback in question, or on the basis of any of the facts or circumstances that played a part in HUD's decision to effect the attempted rent rollback; and

(3) HUD and AHA take no steps in the future to reduce, or to minimize any increase in, contract rents or housing assistance payments for Pebble Creek that otherwise would be available for the owner of Pebble Creek based on any of such facts or circumstances.

### *FINAL JUDGMENT*

Consistent with the memorandum opinion and order signed by the court on the date of the signing of this final judgment,

The court ORDERS, ADJUDGES, DECREES and DECLARES that:

(1) the reductions in contract rents and housing assistance payments defendants, Henry Cisneros, Secretary, United States Department of Housing and Urban Development, (hereinafter "HUD") and Arlington Housing Authority (hereinafter "AHA"), have attempted, and propose, to make in reference to the Pebble Creek Apartments complex in Arlington, Texas, (hereinafter "Pebble Creek") are ineffective and unenforceable, and of no force or effect;

(2) HUD and AHA cease and desist, and are permanently enjoined, from any further attempt to reduce the contract rents or housing assistance payments relating to Pebble Creek based on any audit that has been performed by or on behalf of HUD or AHA or any recalculation, redefinition, or redetermination of the initial contract rents applicable to Pebble Creek;

(3) HUD and AHA take no steps in the future on the basis of any of such facts or circumstances to reduce, or to minimize any increase in, contract rents or housing assistance payments relating to Pebble Creek that otherwise would be available for the owner of Pebble Creek.

(4) plaintiff, 2225 New York Avenue, Ltd., a Texas limited partnership, have and recover from HUD and AHA jointly and severally, costs of court incurred by it in this action; and

(5) all relief sought by the parties not specifically granted herein is denied.