Joan L. WARD, Plaintiff,

v.

Donna E. SHALALA, Secretary, Department of Health and Human Services, Defendant.

Civ. A. No. 94–668–JLL.

United States District Court, D. Delaware.

Aug. 14, 1995.

James T. Perry of Komissaroff & Perry, Wilmington, DE, and Robert M. Hyman and Harvey A. Kirk of Saiontz & Kirk, Baltimore, MD, for plaintiff.

Gregory M. Sleet, United States Attorney, David A. Green, Assistant United States Attorney, Wilmington, DE, and Charlotte Hardnett, Chief Counsel Region III, and Shawn C. Carver, Assistant Regional Counsel, Social Security Administration, Philadelphia, PA, for defendant.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

### I. *Introduction*

Ms. Joan Ward, plaintiff, applied for Social Security disability benefits on June 29, 1992. (D.I. 7 at 66–68.) Her application was denied initially and upon reconsideration (D.I. 69–77.) Ms. Ward then requested a hearing before an Administrative Law Judge ("ALJ"). (D.I. 7 at 78–80.) Such a hearing was held on November 19, 1993 and by a

decision dated June 28, 1994 the ALJ denied her application. (D.I. 7 at 9–24.) Ms. Ward subsequently appealed this denial to the Appeals Council. (D.I. 7 at 7–8.) The Appeals Council concluded that there was no basis to review the ALJ's decision thereby rendering the decision the final judgment of the Secretary of Health and Human Services ("Secretary").[1] (D.I. 7 at 5–6.)

This action is an appeal from the Secretary's decision brought pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (1988), providing the District Court authority to review a final determination of the Secretary. The parties have filed cross-motions for summary judgment.

■ Ms. Ward's insured status ended on December 31, 1990, and thus she was obligated to demonstrate that she was disabled on or prior to this date in order to qualify for benefits. 20 C.F.R. 404.131; *Matullo v. Bowen,* 926 F.2d 240, 244 (3d Cir.1990). At the time of her application, Ms. Ward indicated a disability onset date of June 7, 1985, (D.I. 7 at 66), however, at the hearing her attorney amended the onset date to May 30, 1987. (D.I. 7 at 35.) While evidence of her condition prior to the onset date and after the insured date is to be considered by the ALJ in furtherance of evaluating whether the applicant qualifies for benefits, the period between onset of disability and expiration of insured status is the focus of the inquiry. Ms. Ward was 48 years old at the time of her application for disability benefits, has a high school education, and has previous work experience as an administrative and personnel aid. (D.I. 7 at 13.) While Ms. Ward resigned from her last position in 1985 due to back pain, she does not allege that condition as her disability, rather she alleges that May 1987 was the onset of her disability due to cardiac problems. (D.I. 7 at 42.)

---

1. Under § 106(d)(2) of the Social Security Independence and Program Improvement Act, Pub.L. No. 103–296, 108 Stat. 1464, 1477, Shirley S. Chater, Commissioner of Social Security, is substituted for Donna E. Shalala, Secretary of Health and Human Services. However, because this action arose from a denial of benefits prior to the enactment of the Social Security Independence and Program Improvement Act this opinion will continue to refer to the decision of the Secretary.

## II. Standard of Review

■ This Court's review of the Secretary's factual findings is limited. If the Secretary's findings are supported by substantial evidence, the Court must uphold the findings. 42 U.S.C. § 405(g) (1988). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842; *Dobrowolsky v. Califano,* 606 F.2d 403, 406 (3d Cir.1979); *Fisher v. Secretary of Health and Human Servs.,* 818 F.Supp. 88, 90 (D.Del.1993). The Court of Appeals for the Third Circuit has stated that:

> [t]his oft-cited language is not, however, a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence ... or if it really constitutes not evidence but mere conclusion.... The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir.1983). *See also Brewster v. Heckler,* 786 F.2d 581, 584 (3d Cir.1986). A mere scintilla of evidence is insufficient but substantial evidence may be less than a preponderance. *Woody v. Secretary of Health and Human Servs.,* 859 F.2d 1156, 1159 (3d Cir.1988).

## III. Was The ALJ's Decision Denying Benefits Supported By Substantial Evidence?

■ In determining whether the ALJ's decision was supported by substantial evidence this Court must review the qualitative nature of the evidence in the record according to the standards followed in this Circuit. The Court will summarize Ms. Ward's medical history and then determine if the ALJ's decision based on this medical history and the testimony of Ms. Ward is supported by substantial evidence.

■ The general issue before the Administrative Law Judge is whether the claimant is entitled to a period of disability and disability insurance benefits under Sections 216(i) and 223, respectively, of the Social Security Act, as amended. The regulations promulgated pursuant to the Social Security Act define "disability" as the inability to engage in any substantial gainful activity due to physical or mental impairment(s) which can be expected either to result in death or last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505(a). In order to make a disability determination the ALJ follows a five step process codified at 20 C.F.R. § 404.1520. For the applicant to receive a favorable decision the ALJ must (1) determine that the applicant is not engaged in substantial gainful activity, and (2) determine that the applicant has a severe impairment which significantly limits the applicant's physical or mental ability to do basic work activities, and that this impairment either (3) meets or equals the listings contained in 20 C.F.R., pt. 400, subpt. P, app. 1, or (4) if the applicant has a severe impairment that does not meet or equal these listings, then the ALJ must evaluate the applicant's residual functional capacity and determine that the applicant cannot return to the work that she has done in the past, and finally, (5) if the applicant is unable to do the work that she has done in the past then the ALJ must evaluate the residual functional capacity along with the age, work experience, and education of the applicant in order to determine if the applicant can do other work available in the national economy, if the applicant cannot then the applicant is deemed disabled. 20 C.F.R. § 404.1520.

### A. Ms. Ward's Medical History

Ms. Ward has a long and detailed medical history, documenting her illnesses as well as periods of apparent wellness. In sum, the records show a woman with a family history of early cardiac related death suffering initially from coronary artery disease, developing carotid artery disease, and a single instance of severe pancreatitis all the while

suffering from diabetes. This saga begins in 1987.

The medical records demonstrate that on May 20, 1987 Ms. Ward was admitted to Bebee Hospital emergency room in Lewes, Delaware due to chest pain. The hospital diagnosed her with unstable angina (chest discomfort or pain) and ruled out a myocardial infarction (heart attack). (D.I. 7 at 363.) She was discharged and transferred on May 30, 1987 to Penisula General Hospital Medical Center ("PGHMC") in Salisbury, Maryland where she was admitted until June 9, 1987 with a diagnosis of unstable angina, diabetes mellitus and hypertension (high blood pressure). (D.I. 7 at 108.) On June 1, 1987 while at PGHMC Ms. Ward underwent a cardiac catheterization in order to determine the possible cause of her angina. This catheterization revealed coronary artery disease evidenced by a 100% blocked right coronary artery, a 70% stenosed (narrowed) circumflex coronary artery in the mid portion and 50% stenosis in three left arteries. (D.I. 7 at 113–14.) An angioplasty procedure was scheduled and Ms. Ward was discharged. On June 16, 1987 she was readmitted to PGHMC due to recurrent chest pain apparently brought on by increased stress and the excitement of having some visitors at home. Dr. Raab, her attending physician, attempted to have her angioplasty procedure moved up but on the day it was rescheduled for an emergency bypass surgery had to be done and her procedure was canceled. She was discharged on June 20, 1987 in order to be at home pending her angioplasty procedure and was diagnosed with unstable angina, atherosclerotic heart disease, diabetes mellitus, and hypertension. (D.I. 7 at 120.) Ms. Ward was readmitted on June 29, 1987, when she underwent an unsuccessful angioplasty procedure during which they were unable to clear the 100% occlusion in the right coronary artery which was confirmed by a postangioplasty cardiac catheterization. (D.I. 7 at 131.) She was then scheduled for and underwent elective coronary bypass surgery on two arteries without incident on July 2, 1987. Post-operatively she had a smooth recovery, was rapidly ambulated, and felt to have maximal hospital benefit and thus was discharged home on July 10, 1987. (D. 7 at 121.) The next medical record chronologically is dated August 13, 1987 from Dr. Raab which documents an office visit to follow-up after Ms. Ward's bypass surgery. Dr. Raab stated "Joan returns today in follow up. She really has done quite well since her bypass surgery. She has had no symptoms of angina." (D.I. 7 at 352.) Subsequently, on September 2, 1987, Ms. Ward's husband called to inquire as to Ms. Ward's probable health over the next 10 years. He was informed by a registered nurse of ways to prevent further complications from coronary artery disease. Items discussed included weight control, low sodium, low fat, low cholesterol diet, having cholesterol levels verified frequently, the importance of an exercise program, keeping stress to a minimum, following the drug regime, not smoking, keeping blood pressure under control and having it checked frequently. On September 16, 1987, Ms. Ward returned for an office check-up and was seen by Dr. Wieland. He indicated that she had had some episodes of fluttering in the chest but that otherwise she had had no episodes of chest pain. His assessment was that she was doing well status post coronary artery bypass surgery and also noted ventricular ectopy. (D.I. 7 at 298.) The next visit documented in the record occurred on June 23, 1988. Dr. Wieland indicated that Ms. Ward was feeling relatively well and her physical exam was essentially unremarkable, his assessment was that Ms. Ward remained status post coronary artery bypass surgery doing well. (D.I. 7 at 297.) On October 3, 1988 Dr. Wieland saw Ms. Ward again, the only notable difference in this office visit was a high cholesterol level of 355. It was stressed to her to return to a low cholesterol diet. (D.I. 7 at 297.) She was seen next on May 15, 1989. Dr. Wieland noted that she returned feeling well. Her cholesterol level had dropped to 287. Her physical examination was unchanged and a treadmill test showed no changes at 9 minutes. (D.I. 7 at 296.) There is next a notation on August 8, 1989 indicating various blood measurements. On August 29, 1989 Ms. Ward again saw Dr. Wieland, this time, however, Ms. Ward complained of angina over the last several days. She was started on Nitrobid and Procardia. (D.I. 7 at 138.) She was admitted for the

purpose of a cardiac catheterization which was performed on September 5, 1989. This revealed that the left main coronary artery was without significant stenosis or disease, the LAD had a lesion of approximately 50% in its mid portion, the circumflex was 100% occluded in its mid portion, the right coronary artery was 100% occluded proximally, the aorta circumflex bypass graft was widely patent with good flow, and the aorta right coronary artery bypass graft had a 90% stenosis at its distal anastomosis. Next, on September 13, 1989 there is a notation that Ms. Ward was still anginal and that Nitrobid was begun on her last visit. It was also noted that Ms. Ward was scheduled to have another cardiac catheterization in one week. (Id. at 296.) On September 18, 1989 Ms. Ward was admitted to PGHMC to have a cardiac catheterization and angioplasty. The angioplasty successfully reduced the 90% stenosis of the right coronary artery bypass graft to 20% with evidence of a small tear. Ms. Ward was discharged on September 23, 1989, after being taught how to self-medicate with insulin as her diabetes had become refractory to oral agents. (D.I. 7 at 143–44.) Ms. Ward was then admitted to PGHMC on October 5, 1989 due to a pseudoaneurysm at the site of entry of the cardiac catheter, this was resolved and she was discharged on October 21, 1989. (D.I. 7 at 148–49, 152–53.) On December 25, 1990 Ms. Ward was admitted to the Southwest Florida Regional Medical Center in Fort Myers, Florida, she complained of acute upper quadrant/mid-epigastric pain which had been present since that morning. She was diagnosed with severe necrotizing pancreatitis. She had a prolonged hospital stay in order to stabilize the condition. She was discharged on February 4, 1991. (D.I. 7 at 154–63.) Next on April 8, 1991 she followed up with Dr. Gomez a gastroenterologist who indicated that she was doing well. (D.I. 7 at 164.) On the morning of June 19, 1991 Ms. Ward had a arteriogram after which she went home. However, at home she had a syncopal episode (loss of consciousness) and returned to PGHMC where she was again admitted to PGHMC and was diagnosed with severe left internal carotid stenosis. She denied any definite history of chest pain. (D.I. 7 at 169–72.)

She underwent a left carotid endarterectomy with goretex patch closure on June 21, 1991 and was discharged on June 25, 1991. (D.I. 7 at 173–74.) She was seen by Dr. Wieland on June 24, 1991 at which time he stated that she was nonanginal. (D.I. 7 at 179.) She was seen again on October 15, 1991 appeared to be feeling well and was nonanginal. (D.I. 7 at 180.) The next medical record provided is dated April 21, 1992. (D.I. 7 at 183.) This record indicates that Ms. Ward was in her usual state of health until January, 1992 when she started feeling pain in her jaw while walking. An exercise test was performed which was suggestive of myocardial ischemia (reduced blood flow to the heart) and she was admitted for elective left heart catheterization, coronary arteriography and bypass graft angiography. The attending physician Dr. Stephan Pavlos indicated that his impression was that Ms. Ward had coronary artery disease now with subjective and objective evidence of probable recurrent coronary arterial insufficiency, carotid artery disease, hypercholesterolemia, and diabetes mellitus. Dr. Pavlos indicated that no change in her medications were necessary as her symptoms were exclusively exertional. (D.I. 7 at 184 and 228.) The catheterization revealed that there was two vessel coronary artery disease with normal left ventricular function and significant atherosclerosis in both bypass grafts. (D.I. 7 at 209.) Ms. Ward underwent successful angioplasty on May 22, 1992. The right coronary artery bypass graft had stenosis reduced from 95% to 20% and the circumflex marginal bypass graft was also dilated successfully. (D.I. 7 at 211–12.) Ms. Ward was next admitted on May 25, 1992 for a hematoma that developed at the entry site of the angioplasty in her left groin. She was discharged on June 1, 1992 with the groin area well healed. (D.I. 7 at 213–14.) On June 18, 1992 Ms. Ward had a check-up with Dr. Pavlos. She appeared to be doing well and there was no indication of any angina symptoms. (D. 7 at 230.) Ms. Ward was seen again on July 21, 1992. Dr. Raab's notes indicate that Ms. Ward did not have much in the way of symptoms of heart failure or angina. She did, however, have what sounded like short runs of atrial fibrillation or atrial arrhythmias. She was fitted

with a Holter monitor to record her heart. (D.I. 7 at 236.) The Holter monitor did not show significant symptoms during the period of recording. (D.I. 7 at 242.) On August 19, 1992 a residual functional capacity ("RFC") analysis was done by Dr. Michael Borek as a medical consultant for the Secretary. Dr. Borek concluded that as of her date last insured Ms. Ward's medical history demonstrated that she was restricted to performing "light" jobs. (D.I. 7 at 243–51.) On September 14, 1992 another medical consultant, Dr. Carl Bancoff, a cardiac specialist, reviewed Dr. Borek's findings and agreed with them. (D.I. 7 at 252–54.) Subsequent to the RFC on June 16, 1993, Ms. Ward saw Dr. Wieland who indicated that Ms. Ward reported occasional episodes of angina, but made no changes in her medications. Finally, Ms. Ward was admitted to PGHMC on August 10, 1993 for chest pain. Her discharge date is not indicated, but the plaintiff's memorandum in support of her motion for summary judgment indicates that it was on August 20, 1993. (D.I. 10 at 10.) On November 17, 1993 Dr. Wieland wrote a letter addressed "To whom it may concern," stating that Ms. Ward should be considered for disability and that she is "unable to engage in activity which would allow her to be reasonably employed." (D.I. 7 at 360.) This letter, however, does not indicate at what point in time Dr. Wieland believes that Ms. Ward became disabled. On November 30, 1993 Dr. Wieland wrote a more detailed letter noting her history of diabetes and mentioning a 1990 Stress Thallium Report, (D.I. 7 at 257.) that reportedly showed myocardial ischemia. In fact, that report noted that a breast artifact could not be ruled out, and that clinical correlation was needed. (D.I. 7 at 361.) There was no clinical correlation in the record prior to the expiration of her insured status.

## B. The ALJ's Decision

The first step is to determine whether the applicant has engaged in substantial gainful activity since her alleged disability onset date. The ALJ found that the applicant had not worked since at least May 1987, the alleged disability onset date, and thus was not engaged in substantial gainful activity. (D.I. 7 at 14.) Such a conclusion is supported by the testimony of the applicant and is undisputed. (D.I. 7 at 38–41.)

Next, the ALJ determined in his decision rendered on June 28, 1994, (D.I. 7 at 9–24), that the applicant was suffering from a severe impairment caused by severe coronary artery disease. (*Id.* at 14.) Such a conclusion is supported by substantial evidence demonstrated by the applicable medical records detailed above and the testimony of the applicant in which she stated various limitations she experienced due to her conditions. These limitations included limited lifting ability, as well as reduced ability to stand and to sit. (D.I. 7 at 51–55.)

The ALJ next determined that the severe impairment did not meet or equal any of the listings in the listings of impairments in Appendix 1 of 20 C.F.R., pt. 404, subpt. P, for a period of 12 months. The applicant's representative argued that the applicant did in fact meet Section 4.04 of the Listing of Impairments. However, the ALJ noted, and the medical records support the conclusion, that the applicant did not meet the listing in 4.04 prior to the expiration of her insured status, and in any event did not meet it for any 12 month period prior to the expiration of her insured status. (*Id.*) This is amply demonstrated by the medical records. In order to qualify under 4.04 an individual must have chest discomfort associated with myocardial ischemia, as described in 4.00E3, while on a regimen of prescribed treatment with one of several possible additional symptoms. 20 C.F.R., pt. 404, subpt. P, app. 1, 4.04. Under 4.04A an individual must have an exercise test which demonstrates certain abnormalities. None of the exercise tests in the record satisfy these requirements before the expiration of Ms. Ward's insured status. (D.I. 7 at 185, 292, 296, 298, 301, and 314.) Under 4.04B and 4.04C a physician must have determined that an exercise test would present a significant risk to the individual. Obviously no physician has so determined here as Ms. Ward underwent several separate exercise tests. (*Id.*) Assuming *arguendo* that Ms. Ward met the Section 4.04 listing prior to her bypass surgery, the medical records demonstrate that she had successful bypass surgery which led to an immediate

discontinuance of angina pain and that Ms. Ward did not have any further complaints of chest pain until over two years later in late August, 1989. These new complaints were then relieved by subsequent successful angioplasty on September 18, 1989. (D.I. 7 at 143–44.) The records indicate that pain did not reoccur until at best January 1992. (D.I. 7 at 184 and 228.) So even if Ms. Ward had met the 4.04 listing she did not do so for a period of 12 months prior to the expiration of her insured status as is required for a finding that she was disabled due to her heart condition. 20 C.F.R. § 404.1509. The November 30, 1993 letter by her physician, Dr. Wieland, in support of Ms. Ward's disability application written as it was three years after Ms. Ward's last insured date, and unsupported as it was by the contemporary medical records prior to the expiration of her insured status, was justifiably given little weight by the ALJ.

Next, the ALJ evaluated the residual functional capacity of the claimant and found that the claimant was restricted to "sedentary work"[2] and, because her prior work was of the "light" variety, she was unable to return to her prior work. Such a conclusion was more generous than that reached by the two consulting physicians who concluded that Ms. Ward was capable of returning to "light work"[3] during her insured period. (D.I. 7 at 21–22.) However, based upon a review of the medical records and the applicant's testimony the Court finds that the ALJ's decision is supported by substantial evidence.

■ Ms. Ward argues that the ALJ disregarded her complaints of pain. While an ALJ is required to take a claimant's complaints of pain seriously, such complaints may be discredited by contrary medical reports. At the hearing, Ms. Ward testified that she was never without angina pain, however, medical report after medical report detail follow-up visits in which the doctors reported that Ms. Ward was not suffering from angina pain. Such findings in the medical reports are substantial evidence to uphold the ALJ's determination that Ms. Ward's complaints of pain exaggerated her condition. In addition, the fact that the ALJ found that Ms. Ward was incapable of performing "light work" and could only perform "sedentary work" indicates that he did give some credence to Ms. Ward's complaints of pain.

This brought the ALJ to the final step, a determination as to whether the applicant was able to perform any work that was available in the national economy based upon her residual functional capacity, age, past work experience, and education. The applicant's age on the date last insured was 48 years, this brings her within the "younger person" definition of 20 C.F.R. § 404.1563(b).[4] Ms. Ward had a high school education and had worked as an administrative and personnel aid. (D.I. 7 at 13.)

Ms. Ward complains that the ALJ's decision that there were jobs available was erroneous because a vocational expert was not called to testify. Ms. Ward does not suffer from non-exertional impairments, examples of which are given at 20 C.F.R. § 404.1569a(c), and as a result if she fits a specific vocational profile listed in 20 C.F.R., pt. 404, subpt. P, app. 2, she may be adjudged disabled or not disabled based on the

2. "Sedentary work" is defined as work which: involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

3. "Light work" is defined as work which: involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing an pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. 20 C.F.R. § 404.1567(b).

4. "Younger person" refers to a person under age 50. When evaluating a younger person, age is not considered to seriously affect the claimant's ability to adapt to a new work situation. 20 C.F.R. § 404.1563(b).

tables found there. 20 C.F.R. § 404.1569a(b). Based upon these tables and without calling a vocational expert, the ALJ found that there were jobs available that the applicant could perform and thus rendered a decision finding the applicant not disabled. This Court cannot find evidence that Ms. Ward did not meet the profile selected by the ALJ. This practice of taking administrative notice of the existence of jobs in the national economy in certain categories has been adopted by the Secretary at 20 C.F.R., pt. 404, subpt. P, app. 2, § 200.00(b). The Third Circuit Court of Appeals has noted and approved of "the taking of administrative notice of the general availability of jobs, as opposed to the reliance on the identification of specific tasks by a vocational expert." *Santise v. Schweiker*, 676 F.2d 925, 928 (1982), *cert. dismissed*, 461 U.S. 911, 103 S.Ct. 1889, 77 L.Ed.2d 280 (1983). Therefore, Ms. Ward's complaint that a vocational expert was not called is not actionable.

### IV. Bias Claim Was Waived

The record indicates that Ms. Ward failed to raise the bias claim at any administrative level despite the fact that the regulations provide for the disqualification of prejudiced or partial ALJ's. The claimant must present his claim of bias to the Appeals Council and provide a rationale justifying a request for a revised hearing decision or a new hearing. 20 C.F.R. § 404.940. Fact finding with respect to bias claims is to be done at the administrative level and it is waived if not brought up below. *Hummel v. Heckler*, 736 F.2d 91, 94 (3d Cir.1984); *see also Grant, et al. v. Shalala*, 989 F.2d 1332, 1339 (3d Cir.1993) (district court lacks authority to conduct trial and make independent finding of fact concerning the alleged bias of an ALJ and district court may only review findings of Secretary on this question pursuant to the standard set in 42 U.S.C. § 405(g)). Because Ms. Ward brought up the bias claim for the first time before this Court she is deemed to have waived her bias claim.

### V. Ms. Ward's Constitutional Claims

Ms. Ward raises two "constitutional" arguments for the first time before this Court.

First, Ms. Ward argues that ALJs are not independent adjudicators. Second, Ms. Ward complains that the Justice Department is not the appropriate party to represent the Secretary before this Court and that in any event the Justice Department's briefs are longer and more extensively argued than the decisions of the ALJs they defend.

### A. ALJs Are Independent Adjudicators

Ms. Ward argues that applicants for disability benefits have no way of knowing if the ALJ is qualified to make the decision, and that the ALJs are not independent adjudicators. In her memorandum in support of her motion for summary judgment, Ms. Ward asks this court to rule that the Secretary must require ALJs to provide a curriculum vitae showing the ALJ's "education, work experience, years as an ALJ, favorable versus unfavorable decision record, decision record based on various types of conditions, and his/her record in Federal Court cases." (D.I. 10 at 26.)

This Court finds that as a group ALJs are independent adjudicators and that sufficient safeguards exist to protect applicants from unqualified ALJs. Specifically, the process of agency adjudication is currently structured so as to assure that the ALJs exercise independent judgment on the evidence before them, free from pressures by the parties or other officials within the agency. *Butz v. Economou*, 438 U.S. 478, 513–14, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978). Agency adjudication under the Administrative Procedure Act, 5 U.S.C. §§ 551–59, contains many of the same safeguards that are available in the judicial process and are designed to safeguard the decisional independence of ALJs. *Association of Administrative Law Judges, Inc. v. Heckler*, 594 F.Supp. 1132, 1140 (D.D.C.1984). In addition, although an employee of the Social Security Administration, an ALJ's pay is prescribed by the Office of Personnel Management independent of agency recommendation or ratings, 5 U.S.C. § 5372. Moreover, ALJs may not be assigned duties inconsistent with their responsibilities as an ALJ, 5 U.S.C. § 3105, and they may not communicate ex parte with

anyone inside or outside of the agency about the facts of a particular case, 5 U.S.C. § 557(d)(1). Therefore, plaintiff's claim that ALJs are not independent adjudicators is not supportable, nor in light of the multiple levels of review, including the District Court, is their a necessity for ALJs to present to claimants a curriculum vitae.

### B. The Justice Department Is The Proper Party To Represent The Secretary In Federal Court

 Ms. Ward complains, citing no law, that the Justice Department is not the appropriate party to defend the Secretary in this action and that the Justice Department's briefs are longer and more extensively argued and supported than the ALJ's decision. Except as otherwise authorized by law, Congress directed that the Attorney General shall supervise all litigation to which the United States, an agency, or an officer thereof is a party and shall direct all United States Attorneys, Assistant United States Attorneys, and special attorneys appointed under 28 U.S.C. § 543 in the discharge of their respective duties. 28 U.S.C. § 519. Moreover, Congress authorized that the officers of the Department of Justice, under the direction of the Attorney General, are generally responsible for the conduct of litigation in which the United States, an agency, or an officer thereof is a party. 28 U.S.C. § 516. In the absence of any countervailing law pointed out by Ms. Ward this Court will not hamper the Justice Department's duties in this case.

 Ms. Ward further argues that, in the alternative, this Court should issue guidelines to the Justice Department to circumscribe what she perceives of as the persistent abuse by the Justice Department in writing briefs that are longer and more extensive in their argument than the ALJ's decision. The Third Circuit Court of Appeals has found that judicial review of the Secretary's decision under 42 U.S.C. § 405(g) should be based on the record as a whole. *Monsour Medical Ctr. v. Heckler,* 806 F.2d 1185, 1190 (1986), *cert. denied,* 482 U.S. 905, 107 S.Ct. 2481, 96 L.Ed.2d 373 (1987). Because judicial review of the Secretary's findings is based upon the record taken as a whole, the court may look to evidence in the record regardless of whether it has been cited to by the Secretary in her final decision. *Walker v. Secretary of Health and Human Servs.,* 884 F.2d 241, 245 (6th Cir.1989). Moreover, it is often the case that the Justice Department must respond to arguments made for the first time at the District Court level, as was the case here regarding Ms. Ward's allegations of bias, as well as her constitutional claims. Therefore Ms. Ward's argument regarding the propriety of the Justice Department defending the Secretary in Federal Court as well as the length and extensive argument contained in their briefs is simply without merit.

### VI. Conclusion

Although Ms. Ward presents a sympathetic case, it is not for this Court to determine whether it would have made the same decision as the ALJ but simply whether the ALJ's decision was supported by substantial evidence. As detailed above, a careful review of the entire record including the claimant's application, the transcript of the hearing before the ALJ, and the profuse medical records reveals that the ALJ's decision that the claimant is not disabled was supported by substantial evidence. The plaintiff's claim regarding the ALJ's bias was not raised below and is therefore waived. In addition, plaintiff's constitutional claims concerning an ALJ's qualifications and the appropriateness of the Justice Department defending the Secretary are meritless. Therefore, plaintiff's summary judgment motion will be denied in its entirety, and defendant's summary judgment motion will be granted in its entirety. An order in conformity with the forgoing will issue forthwith.